**Nos. 18-15431, 18-15887**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CONSUMER FINANCIAL PROTECTION BUREAU,
*Plaintiff-Appellee/Cross-Appellant,*

*v.*

NATIONWIDE BIWEEKLY ADMINISTRATION, INC.;
LOAN PAYMENT ADMINISTRATION LLC; DANIEL LIPSKY,
*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Hon. Richard Seeborg
Case No. 3:15-cv-02106-RS

**SECOND CROSS-APPEAL AND ANSWERING BRIEF
OF PLAINTIFF-APPELLEE AND CROSS-APPELLANT
CONSUMER FINANCIAL PROTECTION BUREAU**

Mary McLeod
  *General Counsel*
John R. Coleman
  *Deputy General Counsel*
Steven Y. Bressler
  *Assistant General Counsel*
Kristin Bateman
Thomas McCray-Worrall
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-9683 (telephone)
(202) 435-7024 (facsimile)
thomas.mccray-worrall@cfpb.gov

January 25, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY ................................................................................ xiv

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATEMENT OF ISSUES ................................................................ 4

    A. Nationwide's Appeal ............................................................ 4

    B. The Bureau's Cross-Appeal .................................................. 6

PERTINENT STATUTES AND RULES ............................................... 6

STATEMENT OF THE CASE ............................................................ 6

    A. Facts ................................................................................. 6

    B. Statutory Background ........................................................... 9

    C. Proceedings and Decision Below ......................................... 10

        1. The Bureau's complaint ................................................. 10

        2. Nationwide's counterclaims ............................................ 11

        3. Pre-trial .................................................................... 11

        4. Trial ......................................................................... 12

        5. Post-trial .................................................................... 13

SUMMARY OF ARGUMENT .......................................................... 15

  I. Nationwide's Appeal ............................................................. 15

  II. The Bureau's Cross-Appeal ................................................... 18

ARGUMENT ............................................................................... 21

  I. Nationwide's Appeal ............................................................. 21

    A. Standard of Review ............................................................ 21

    B. The district court did not abuse its discretion in finding that Nationwide failed to prove its statute of limitations defense. ................... 21

        1. The district court did not err in determining that the Bureau's receipt of a single consumer complaint did not constitute discovery of Nationwide's violations of the CFPB and TSR ............... 23

i

2.  The district court did not err in concluding that the limitations period under the CFPB did not begin running as a result of a settlement agreement the Bureau's former Director approved in his prior role as a state official ..................................................28

3.  Nationwide's remaining arguments regarding the CFPA's statute of limitations are without merit and, regardless, would not affect the district court's rulings..........................................................29

C.  The district court did not err in striking Nationwide's delinquent jury demand. .....................................................................................30

D.  The well-established meaning of "deceptive" under the CFPA provides fair notice for due process purposes..............................................38

E.  This Court has already established the meaning of "deceptive" under the CFPA. .....................................................................................41

F.  The CFPA does not require the Bureau to choose between legal and equitable relief...........................................................................43

G.  The district court did not err in its civil penalty calculation, particularly where Nationwide offered no evidence to challenge that calculation. .....................................................................................47

H.  Because Nationwide did not move the district court to amend its findings under Fed. R. Civ. P. 52(b), Nationwide cannot challenge the adequacy of those findings on appeal. ...................................51

I.  The district court's findings of CFPA violations were supported by evidence at trial and therefore did not constitute clear error. ....................57

J.  The district court did not err in concluding that Nationwide's telephone sales campaign constituted telemarketing under the TSR..........63

K.  The district court did not misapply the stigma-plus test, as it did not find any actionable stigma caused by the Bureau......................................66

L.  The district court did not abuse its discretion in excluding from evidence hearsay and other materials that NBA had failed to link to any witness or other evidence. ...................................................68

ii

M. The district court did not abuse its discretion in concluding that NBA failed to establish the foundation necessary to qualify Brian Kelley as an expert..................................................................71

N. Nationwide's challenge to the Bureau's constitutionality is waived and, regardless, lacks merit. .........................................74

O. The district court's injunction was not issued in error and is not overbroad..............................................................77

P. Nationwide's claim of cumulative error does not entitle it to a new trial. ...................................................................82

II. The Bureau's Cross-Appeal .........................................................84

A. Standard of Review .................................................................84

B. The district court applied erroneous legal principles in declining to award restitution..........................................................85

1. The district court lacked discretion to deny legal restitution based on a balancing of the equities and, regardless, abused any discretion it had to exercise.................................................86

2. The district court misapplied this Court's precedent in concluding that the Bureau had not established an appropriate amount of restitution..............................................................91

CONCLUSION...................................................................................98

STATEMENT OF RELATED CASES ...............................................100

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Addington v. Texas*,
  441 U.S. 418 (1978) ............................................................................. 53

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405 (1975) ................................................................. 89, 91, 93

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*,
  388 F.3d 405 (3d Cir. 2004) ................................................................. 77

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
  643 F.3d 1165 (9th Cir. 2010) ............................................................. 79

*Armco, Inc. v. Armco Burglar Alarm Co.*,
  693 F.2d 1155 (5th Cir. 1982) ............................................................. 35

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ............................................................... 82

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ............................................................... 38

*Badaracco v. Comm'r*,
  464 U.S. 386 (1984) ...................................................................... 22, 29

*Barber v. Thomas*,
  560 U.S. 474 (2010) ............................................................................. 30

*Bojnoordi v. Holder*,
  757 F.3d 1075 (9th Cir. 2014) ............................................................. 74

*Boyle v. Lorimar Prods., Inc.*,
  13 F.3d 1357 (9th Cir. 1994) ............................................................... 50

*CFPB v. CashCall, Inc.*,
  2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) .................................... 39

iv

*CFPB v. D & D Mktg., Inc.*,
   2017 WL 5974248 (C.D. Cal. Mar. 21, 2017) ..................................... 39

*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
   114 F. Supp. 3d 1342 (N.D. Ga. 2015)................................................ 54

*CFPB v. Gordon*,
   819 F.3d 1179 (9th Cir. 2016) ...................................................... *passim*

*CFPB v. Think Fin., LLC*,
   2018 WL 3707911 (D. Mont. Aug. 3, 2018)................................. 39, 53

*Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*,
   159 F.3d 412 (9th Cir. 1998) .............................................................. 31

*Cliffdale Assocs.*,
   103 F.T.C. 110 (1984) ......................................................................... 42

*Codd v. Velger*,
   429 U.S. 624 (1977).............................................................................. 67

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ............................................................ 78

*Consolidated Aluminum Corp. v. Foseco International Ltd.*,
   910 F.2d 804 (Fed. Cir. 1990) ............................................................ 52

*Crowe v. Cty. of San Diego*,
   13 F. App'x 560 (9th Cir. 2001)......................................................... 67

*Curtis v. Loether*,
   415 U.S. 189 (1974)....................................................................... 87, 88

*Daniel Int'l Corp. v. Fischbach & Moore, Inc.*,
   916 F.2d 1061 (5th Cir. 1990) ............................................................ 36

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) .............................................................. 72

v

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ............................................................. 72

*De Sylva v. Ballentine*,
   351 U.S. 570 (1956) ............................................................. 46

*Dimaya v. Lynch*,
   803 F.3d 1110 (9th Cir. 2015) ...................................... 38, 39

*Dumont v. United States*,
   98 U.S. 142 (1878) ............................................................... 45

*E.I. Du Pont de Nemours & Co. v. Davis*,
   264 U.S. 456 (1924) ............................................................. 22

*El Pollo Loco, Inc. v. Hashim*,
   316 F.3d 1032 (9th Cir. 2003) ........................................... 85

*Elsayed Mukhtar v. California State Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002) ........................................... 72

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ............................................................. 38

*FDIC v. McSweeney*,
   976 F.2d 532 (9th Cir. 1992) ............................................. 43

*Fed. Election Comm'n v. Ted Haley Cong. Comm.*,
   852 F.2d 1111 (9th Cir. 1988) ........................................... 47

*Free Enter. Fund v. Accounting Oversight Bd.*,
   561 U.S 477 (2010) ............................................................. 75

*FTC v. Commerce Planet, Inc.*,
   815 F.3d 593 (9th Cir. 2016) .......................... 41, 86, 87, 92

*FTC v. Figgie Int'l, Inc.*,
   994 F.2d 595 (9th Cir. 1993) .......................... 94, 95, 96, 97

*FTC v. Pantron I*,
  33 F.3d 1088 (9th Cir. 1994) ........................................................ *passim*

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009) ................................................................. 56

*Fuller v. City of Oakland, Cal.*,
  47 F.3d 1522 (9th Cir. 1995) ................................................................. 33

*Gabelli v. SEC*,
  568 U.S. 442 (2013) .............................................................................. 29

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .............................................................................. 72

*Gonzales v. Arrow Fin. Servs., LLC*,
  660 F.3d 1055 (9th Cir. 2011) .............................................................. 90

*Gonzales v. Police Dep't, City of San Jose, Cal.*,
  901 F.2d 758 (9th Cir. 1990) ................................................................. 83

*Gordon Mailloux Enterprises, Inc. v. Firemen's Insurance Co.*,
  366 F.2d 740 (9th Cir. 1966) ................................................................. 83

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) .............................................................................. 87

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001) ....................................................... 41, 43

*Hollinger v. United States*,
  651 F.2d 636 (9th Cir. 1981) ................................................................. 52

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) .............................................................................. 75

*In re Hanford Nuclear Reservation Litig.*,
  292 F.3d 1124 (9th Cir. 2002) .............................................................. 72

*Irving Tanning Co. v. Kaplan*,
876 F.3d 384 (1st Cir. 2017)................................................................. 52

*Johnson v. United States*,
135 S. Ct. 2551 (2015)........................................................................ 39

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991)............................................................................ 46

*Kohler v. Presidio Int'l, Inc.*,
782 F.3d 1064 (9th Cir. 2015) ............................................................ 57

*Las Vegas Sun, Inc. v. Summa Corp.*,
610 F.2d 614 (9th Cir. 1979) .............................................................. 34

*Los Angeles News Serv. v. CBS Broad., Inc.*,
305 F.3d 924 (9th Cir.) ................................................................. 69, 70

*Loughrin v. United States*,
134 S. Ct. 2384 (2014)........................................................................ 45

*Lutz v. Glendale Union High Sch.*,
403 F.3d 1061 (9th Cir. 2005) .................................................... *passim*

*Marshall v. Chala Enters., Inc.*,
645 F.2d 799 (9th Cir. 1981) .............................................................. 89

*Mathews v. Chevron Corp.*,
362 F.3d 1172 (9th Cir. 2004) ............................................................ 63

*Merck v. Reynolds*,
559 U.S. 633 (2010)........................................................ 21, 24, 25, 26

*Mitchell v. Robert DeMario Jewelry*,
361 U.S. 288 (1960)............................................................................ 89

*Mondaca-Vega v. Lynch*,
808 F.3d 413 (9th Cir. 2015) .............................................................. 51

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................... 75

*Muniz v. Amec Constr. Mgmt., Inc.*,
    623 F.3d 1290 (9th Cir. 2010) ........................................................... 68

*NLRB v. Express Publ'g Co.*,
    312 U.S. 426 (1941) ........................................................................... 78

*Nunes v. Ashcroft*,
    375 F.3d 805 (9th Cir. 2004) ............................................................. 49

*Oja v. U.S. Army Corps of Engineers*,
    440 F.3d 1122 (9th Cir. 2006) ........................................................... 22

*Ollier v. Sweetwater Union High Sch. Dist.*,
    267 F.R.D. 339 (S.D. Cal. 2010) ....................................................... 73

*Pac. Fisheries v. HIH Cas. & Gen. Ins., Ltd.*,
    239 F.3d 1000 (9th Cir. 2001) ..................................................... 31, 37

*Paul v. Davis*,
    424 U.S. 693 (1976) ........................................................................... 67

*PHH v. CFPB*,
    881 F.3d 75 (D.C. Cir. 2018) ............................................... 75, 76, 77

*Pollard v. White*,
    119 F.3d 1430 (9th Cir. 1997) ........................................................... 84

*Pradier v. Elespuru*,
    641 F.2d 808 (9th Cir. 1981) ....................................................... 34, 35

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ............................................................. 72

*Russ v. Standard Ins. Co.*,
    120 F.3d 988 (9th Cir. 1997) ................................................. 31, 32, 37

*Rutledge v. Elec. Hose & Rubber Co.*,
    511 F.2d 668 (9th Cir. 1975) ............................................................... 33

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ........................................................ 79, 80

*Singleton v. Wulff*,
    428 U.S. 106 (1976) ............................................................................ 82

*Solis v. Cty. of Los Angeles*,
    514 F.3d 946 (9th Cir. 2008) ............................................................. 35

*Tovar v. U.S.P.S.*,
    3 F.3d 1271 (9th Cir. 1993) ............................................................... 22

*Tracinda Corp. v. DaimlerChrysler AG*,
    502 F.3d 212 (3d Cir. 2007) ............................................................. 35

*Ulrich v. City & Cty. of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) ............................................................. 67

*United States v. F/V Repulse*,
    688 F.2d 1283 (9th Cir. 1982) ..................................................... 53, 54

*United States v. Fisk*,
    70 U.S. 445 (1865) ............................................................................. 46

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ................................................. *passim*

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ........................................................... 71

*United States v. Hayward*,
    36 F.3d 832 (9th Cir. 1994) ............................................................... 87

*United States v. Johnson*,
    256 F.3d 895 (9th Cir. 2001) ............................................................. 43

*United States v. Laerdal Mfg. Corp.*,
    73 F.3d 852 (9th Cir. 1995) ................................................................. 78

*United States v. Lee*,
    183 F.3d 1029 (9th Cir. 1999) ............................................................ 63

*United States v. Migi*,
    329 F.3d 1085 (9th Cir. 2003) ..................................................... 41, 44

*United States v. Moore*,
    340 U.S. 616 (1951) ............................................................................ 33

*United States v. Olano*,
    507 U.S. 725 (1993) ............................................................................ 33

*United States v. Payne*,
    944 F.2d 1458 (9th Cir. 1991) ............................................................ 70

*United States v. Santos*,
    553 U.S. 507 (2008) ............................................................................ 30

*United States v. Tosca*,
    18 F.3d 1352 (6th Cir. 1994) .............................................................. 52

*United States v. Turner*,
    689 F.3d 1117 (9th Cir. 2012) ............................................................ 30

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953) ..................................................................... 78, 79

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................ 38

*Wendell v. GlaxoSmithKline, LLC*,
    858 F.3d 1227 (9th Cir. 2017) ..................................................... 48, 51

*Wirtz v. Malthor, Inc.*,
    391 F.2d 1 (9th Cir. 1968) ........................................................... 90, 91

*White v. McGinnis*,
 903 F.2d 699 (9th Cir. 1990) .................................................................. 35

*Whitman v. Am. Trucking Associations*,
 531 U.S. 457 (2001) .............................................................................. 46

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
 471 U.S. 626 (1985) .............................................................................. 82

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969) .............................................................................. 78

## **Statutes**

12 U.S.C. § 5481 ................................................................................ 43, 46

12 U.S.C. § 5491 ................................................................................ 46, 75

12 U.S.C. § 5497 ...................................................................................... 76

12 U.S.C. § 5531 ............................................................................. 9, 10, 54

12 U.S.C. § 5536 ................................................................................. *passim*

12 U.S.C. § 5564 ................................................................................. *passim*

12 U.S.C. § 5565 ................................................................................. *passim*

15 U.S.C. § 41 .......................................................................................... 75

15 U.S.C. § 6102 ...................................................................................... 10

28 U.S.C. § 1291 ........................................................................................ 3

28 U.S.C. § 1331 ........................................................................................ 3

28 U.S.C. § 1345 ........................................................................................ 3

28 U.S.C. § 1658 ...................................................................................... 25

42 U.S.C. § 3612 ................................................................................. 88

## **Rules**

Fed. R. App. P. 4 ................................................................................. 3

Fed. R. App. P. 28 .............................................................................. 15

Fed. R. Civ. P. 11 .............................................................................. 24

Fed. R. Civ. P. 38 .................................................................... *passim*

Fed. R. Civ. P. 39 ................................................................. 31, 36, 37

Fed. R. Civ. P. 52 .................................................................... *passim*

Fed. R. Civ. P. 59 ........................................................................ 3, 52

Fed. R. Civ. P. 60 ............................................................................... 3

## **Regulations**

16 C.F.R. § 310.2 .................................................................... *passim*

16 C.F.R. § 310.3 ......................................................................... 9, 10

16 C.F.R. § 310.6 ....................................................................... 64, 65

## **Other Authorities**

75 Fed. Reg. 57,252 (Sept. 20, 2010) .............................................. 38

Dan B. Dobbs, *Law of Remedies* (2d ed. 1993) ......................... 86, 87

Restatement (Third) of Restitution § 4 (2011) ................................. 86

# GLOSSARY

| | |
|---|---|
| Br. | First Brief of Appellants Nationwide Biweekly Admin., *et al.*, Dkt. No. 29 |
| Bureau | Consumer Financial Protection Bureau |
| CFPA | Consumer Financial Protection Act |
| ER | Appellants' Excerpts of Record, Dkt. No. 22 |
| FTC | Federal Trade Commission |
| FTC Act | Federal Trade Commission Act |
| IM Program | Interest Minimizer Program |
| Nationwide | Appellants Nationwide Biweekly Admin., Inc.; Loan Payment Administration LLC; and Daniel Lipsky |
| NBA | Nationwide Biweekly Admin., Inc. |
| SER | The Bureau's Supplemental Excerpts of Record |
| TSR | Telemarketing Sales Rule |

**INTRODUCTION**

This appeal arises from an enforcement action that the Consumer Financial Protection Bureau ("Bureau") brought against Appellants Nationwide Biweekly Administration, Inc. ("NBA"); Loan Payment Administration LLC; and Daniel Lipsky (collectively, "Nationwide") for deceiving consumers in the marketing and sale of a biweekly mortgage payment product Nationwide dubbed the "Interest Minimizer Program" or "IM Program." As the district court found, Nationwide falsely promised consumers that its program could quickly save them thousands of dollars in mortgage interest and that similar programs were not available elsewhere. Nationwide further advanced its scheme by leading consumers to believe, incorrectly, that it was somehow affiliated with consumers' lenders.

Nationwide's misleading marketing efforts paid off, most notably for the company's president and sole owner, Daniel Lipsky. Nationwide convinced over 126,000 consumers to enroll in its IM Program and collected more than $73 million in fees – more than $33 million of which was distributed to Mr. Lipsky alone. The district court found that Nationwide violated the prohibitions on deceptive and abusive conduct under the Consumer Financial Protection Act of 2010 ("CFPA"), as well as similar prohibitions under the Telemarketing Sales Rule ("TSR"). As a remedy the court imposed a civil penalty of $7.93 million and ordered injunctive relief to protect consumers from future violations by

1

Nationwide. But the court denied the Bureau's request for restitution for the injured consumers.

Faced with this multi-million dollar penalty, Nationwide has resorted to a shot-gun approach in its appeal, raising fifteen separate issues and multiple sub-issues in the hope that one of its arguments might hit the mark. It also attempts to resuscitate counterclaims by NBA[1] blaming the Bureau for its lost banking relationships – claims that the district court found failed for lack of proof and were better explained by the company's own strained relationships with its banks. Struggling to find error by the district court, Nationwide raises perfunctory legal arguments and makes factual and legal errors that only confirm the lack of merit in its appeal.

The Bureau has cross-appealed the district court's denial of its request for restitution. Despite finding that consumers paid Nationwide millions of dollars for a program that Nationwide deceptively promised would quickly provide substantial interest savings, the district court declined to award *any* restitution to compensate consumers for their losses. That decision leaves consumers uncompensated and would undermine effective enforcement of the CFPA by allowing Nationwide to keep all of the more than $73 million it collected from the consumers it deceived.

---

[1] Nationwide Biweekly, Admin., Inc. was the sole counter-plaintiff to the counterclaims. *See* ER 2717-18. As noted above, the Bureau refers to the company in its individual capacity as "NBA," and to all defendants collectively (including Loan Payment Administration LLC and Mr. Lipsky) as "Nationwide."

Such results cannot be squared with the statute or with the burden-shifting framework that this Court has established for determining restitution awards under the CFPA.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the Bureau's enforcement action because it was "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presented a federal question, 28 U.S.C. § 1331, and was brought by an agency of the United States, *id.* § 1345. The district court had jurisdiction over NBA's counterclaims under 28 U.S.C. § 1331. The district court entered final judgment disposing of all parties' claims on November 9, 2017. ER 7. Following entry of judgment, Nationwide filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59 and a motion for relief under Fed. R. Civ. P. 60. *See* ER 131, 145. The court denied both motions on March 12, 2018. ER 6. Nationwide filed a timely notice of appeal on March 15, 2018. ER 64; *see* Fed. R. App. P. 4(a)(1)(B), 4(a)(4)(A). The Bureau filed a timely notice of appeal on May 10, 2018. Supplemental Excerpts of Record ("SER") 1; *see* Fed. R. App. P. 4(a)(1)(B), 4(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

### A. Nationwide's Appeal

1. Whether the district court erred in finding that Nationwide failed to prove its statute of limitations defense.

2. Whether the district court erred in striking Nationwide's untimely jury demand.

3. Whether the prohibition against "deceptive" conduct under the CFPA provides fair notice for due process purposes.

4. Whether the district court erred in applying the meaning of "deceptive" under the CFPA as established under this Court's precedents.

5. Whether the CFPA prohibits the Bureau from seeking civil money penalties as well as legal and equitable relief against persons who violate the Act.

6. Whether the district court erred as a matter of law in its civil penalty calculation where Nationwide offered no evidence to challenge that calculation.

7. Whether Nationwide may seek this Court's review of the adequacy of the district court's findings under Fed. R. Civ. P. 52(a) when Nationwide failed to move the district court for amended or additional findings as required under Fed. R. Civ. P. 52(b).

8. Whether the district court's factual findings regarding Nationwide's CFPA violations constituted clear error.

9.      Whether Nationwide may challenge the adequacy of the district court's findings regarding the TSR when Nationwide failed to move the district court for amended or additional findings as required under Fed. R. Civ. P. 52(b).

10.     Whether the district court erred in its application of the stigma-plus test, where its determination that the Bureau did not defame Nationwide obviated the need to further apply the test.

11.     Whether the district court abused its discretion in excluding from evidence out-of-court statements and other materials NBA failed to link to any witness or other evidence.

12.     Whether the district court abused its discretion in concluding that NBA failed to establish the foundation necessary to qualify its proposed expert witness.

13.     Whether Nationwide has waived its constitutional argument regarding the Bureau's structure by failing to adequately brief the issue, or whether its argument is otherwise without merit.

14.     Whether the district court erred in issuing an injunction prohibiting further illegal conduct by Nationwide, and whether the scope of the court's injunction constituted an abuse of discretion.

15.     Whether Nationwide has identified cumulative errors resulting in prejudice warranting a new trial.

## B. The Bureau's Cross-Appeal

1.  Whether the district court erred in refusing to order Nationwide to pay restitution of the amounts that consumers paid Nationwide in response to its misrepresentations.

## PERTINENT STATUTES AND RULES

See attached statutory addendum.

## STATEMENT OF THE CASE

## A. Facts[2]

This appeal arises from an enforcement action the Bureau brought against Nationwide for collecting over $73 million from consumers in a deceptive scheme to market Nationwide's mortgage payment product, the "IM Program." ER 6, 34. Under the IM Program, Nationwide arranged to debit, every two weeks, an amount equal to one-half of the consumer's monthly mortgage payment from the consumer's bank account. Each month, Nationwide then forwarded an amount equal to two of these biweekly payments (*i.e.*, a full month's payment) to the customer's lender. ER 18.

---

[2] The recitation of facts in Nationwide's brief relies on self-serving statements from its own filings, the testimony of its own witnesses, and unsupported factual assertions. *See* First Brief of Appellants Nationwide Biweekly Admin., *et al.*, Dkt. No. 29 ("Br."), 6-16. Nationwide does not establish how the district court erred in declining to adopt this version of the facts.

Because biweekly debiting results in 26 payments each year (equivalent to 13 monthly payments), two of the consumer's biweekly payments each year would constitute one additional mortgage payment that, if applied to the consumer's principal loan balance, would more quickly reduce the principal and total interest charges over the life of the loan. *See* ER 18-19. Nationwide touted these potential savings in marketing the IM Program, claiming that the program could save consumers thousands of dollars within the first two years of enrollment. ER 29.

But the savings Nationwide promised to consumers did not actually materialize in that timeframe. Instead, the savings Nationwide touted in the first years were simply the average of *all* the annual savings consumers could realize *if* they remained in the IM Program for the entire life of their loans – which could be as long as 30 years. *See* ER 29-30. But the average savings over the life of the loan did not reflect consumers' actual savings in the first years because Nationwide kept the consumer's first "extra" biweekly payment for itself as a "set-up fee" (up to $995), thus depriving the consumer of any immediate savings. *See* ER 18, 22-23, 30. The loss of the setup fee and the slow accumulation of interest savings over the life of the loan meant that typical consumers "would not reach a 'break-even' point until after making approximately nine years' worth of payments under the IM program." ER 27. These significant delays in savings were not apparent in

Nationwide's claims of "average" or "immediate" savings and thus, as the district court found, "likely would mislead a reasonable consumer." ER 30.

Nationwide's misleading representations went further. It told consumers that the only way to achieve savings through a biweekly payment program was by enrolling with a third-party administrator like Nationwide. *See* ER 31. That representation was misleading, particularly for those consumers whose lenders provided biweekly payment options at no charge. *See id.* Nationwide also misled consumers into believing that its mailings came directly from the consumer's own lender. ER 19, 26. Those mailings created the misleading impression that consumers had an obligation to respond, cautioning consumers that "[i]f you waive the biweekly option" they would be asked to confirm that they were "voluntarily waiving the interest saving and loan term reduction." ER 26.

Nationwide conducted an extensive telemarketing campaign for its IM Program, fielding millions of telephone calls in response to its direct mail solicitations. ER 19-20. Such calls typically lasted between 30 minutes and an hour for those who enrolled. ER 20. Nationwide's sales representatives used prepared scripts – written largely by Mr. Lipsky – to explain and sell the IM Program. ER 20. Over 126,000 consumers enrolled in Nationwide's IM Program,

from whom Nationwide collected more than $73 million in set-up fees between July 21, 2011 and December 31, 2015.[3] ER 19, 34.

## B. Statutory Background

The CFPA makes it unlawful for entities that offer consumer financial products and services "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). The Act empowers the Bureau to enforce this prohibition and to enforce other federal consumer financial laws. *See id.* §§ 5531(a), 5564(a). The Act provides a broad range of relief for violations of the laws that the Bureau enforces, authorizing courts to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law." *Id.* § 5565(a)(1). Such relief may include, "without limitation," remedies such as restitution, money refunds, disgorgement, payment of damages, and civil money penalties. *Id.* § 5565(a)(2).

The TSR requires that, before a customer consents to pay for goods or services, a telemarketer or seller must disclose "truthfully" and "in a clear and conspicuous manner" certain facts, including "the total costs to purchase . . . goods or services that are the subject of the sales offer." 16 C.F.R. § 310.3(a)(1)(i). The

---

[3] Nationwide collected $73,955,169 in fees; this was the amount that the district court found the Bureau established as Nationwide's total revenue from setup fees, less refunds paid, from July 21, 2011 to December 21, 2015. ER 34. As the district court noted, Nationwide presented no evidence or argument questioning the accuracy of these figures. ER 35.

TSR also prohibits telemarketers and sellers from misrepresenting, directly or by implication, "the total costs to purchase . . . goods or services," "[a]ny material aspect of the performance, efficacy, nature or central characteristics" of the goods or services, or the seller or telemarketer's "affiliation with . . . any person." *Id.* § 310.3(a)(2)(i), (iii), and (vii). The TSR further prohibits telemarketers and sellers from making "a false or misleading statement to induce any person to pay for goods or services." *Id.* § 310.3(a)(4). A violation of the TSR by a person subject to the CFPA is treated as a violation of a rule under the CFPA's prohibition against unfair, deceptive, or abusive acts or practices. *See* 15 U.S.C. § 6102(c)(2), 12 U.S.C. § 5531.

## C. Proceedings and Decision Below

### 1. The Bureau's complaint

The Bureau filed its complaint on May 11, 2015. *See* ER 32, 2917-19. The complaint alleged that in marketing and selling the IM Program, Nationwide committed abusive and deceptive acts or practices in violation of the CFPA (Counts I and II) and deceptive telemarketing acts or practices in violation of the TSR and CFPA (Count III), and that Nationwide's TSR violations constituted violations of the CFPA (Count IV).[4] *See* ER 2925-28. As relevant here, the Bureau sought restitution, disgorgement, civil money penalties, and a permanent

---

[4] Loan Payment Administration LLC was named as a defendant only under Count II of the complaint.

injunction prohibiting Nationwide from committing future violations of the CFPA or TSR. ER 2929.

### 2. Nationwide's counterclaims

On June 13, 2016 NBA filed counterclaims alleging that the Bureau engaged in "extra-judicial" pressure tactics to coerce banks into ending their relationships with NBA. *See* ER 38, 2719.[5] NBA alleged that the Bureau's actions were part of what it called "Operation Choke Point" and violated its First Amendment rights (Count I) and its Fifth Amendment Due Process rights, as well as the Administrative Procedure Act (Count II). NBA also sought declaratory relief and a permanent injunction (Count III). ER 2747-53.

### 3. Pre-trial

In December 2016 the parties filed cross-motions for summary judgment, all of which the court denied. ER 40-41. The Bureau then filed a motion to strike Nationwide's jury demand, which the district court later granted. ER 1976, 54. In preparation for trial the Bureau filed various motions in limine, including a motion the court later granted to exclude Brian Kelley as an expert witness in support of NBA's counterclaims. ER 52, 1470.

---

[5] NBA had previously filed counterclaims in this matter, but the court granted the Bureau's motion to dismiss those claims. *See* ER 38-39. NBA filed amended counterclaims alleging additional facts, and the court denied the Bureau's subsequent motion to dismiss those claims. *Id.*

### 4. Trial

The court conducted a bench trial beginning on April 24, 2017. Over the course of six days the Bureau presented evidence in support of its claims that Nationwide violated the CFPA and TSR through misrepresentations and omissions regarding four topics: (1) the set-up fee Nationwide charged consumers, (2) Nationwide's affiliation with consumers' lenders, (3) the timing and amount of interest savings under the IM Program, and (4) consumers' ability to achieve similar savings without the IM Program. *See* ER 18, 25, 27, 31.

Following the close of the Bureau's affirmative case, NBA presented its counterclaims. Mr. Lipsky was the only witness NBA called at trial in support of its counterclaims. Mr. Lipsky offered no testimony establishing that the Bureau pressured NBA's banks to take any action regarding the company, nor any testimony regarding what NBA alleged was "Operation Choke Point." *See, e.g.*, SER 18-20. Following Mr. Lipsky's testimony, NBA moved for admission into evidence eleven exhibits, all of which contained out-of-court statements to which the Bureau objected on hearsay and relevance grounds. The court sustained the Bureau's objections. SER 30-43.

NBA entered into evidence a press release the Bureau issued simultaneously with the filing of its complaint, which stated that the Bureau's allegations were "not a finding or ruling that the defendants have actually violated the law." ER

1269-70.  Nationwide also introduced the deposition testimony of one of its banking partners.  *See* ER 605.  As the bank's representative testified, as early as two years before the Bureau's lawsuit the bank's relationship with NBA had "deteriorated" as a result of Nationwide's "high-risk" business, concerns regarding its profitability, and Mr. Lipsky's refusal to meet with the bank.  ER 646, 626, 633.  The bank's representative further confirmed that the Bureau never contacted the bank about NBA.  ER 650-51.

The court then recessed, directing the parties to file post-trial briefings and proposed findings of fact and conclusions of law.  On its claims, the Bureau sought restitution of $73,955,169 from defendants jointly and severally, disgorgement of $33,039,299 from Mr. Lipsky, civil penalties of $7,930,000 against each defendant, and an injunction prohibiting future violations.  ER 34-35, 37.  On its counterclaims, NBA sought injunctive relief prohibiting the Bureau from interfering with NBA's banking relationships.  ER 580.  The court heard closing arguments on June 26, 2017.  ER 2976.

### 5.  Post-trial

On September 8, 2017 the district court issued its findings of fact and conclusions of law.  ER 17.  The court found that Nationwide made misrepresentations and omissions regarding Nationwide's affiliation with consumers' lenders, the timing and amount of interest savings, and consumers'

ability to achieve similar savings without the IM Program. ER 25, 27, 31. However, the court found that the Bureau did not prove liability on its claims regarding the existence or amount of Nationwide's set-up fee. ER 18. The court concluded that Nationwide's misrepresentations and omissions were sufficient to support liability for the Bureau's claims under both the "deceptive" and "abusive" provisions of the CFPA and under the TSR. ER 34 n.24. The district court denied the Bureau's request for restitution and disgorgement, but imposed civil penalties of $7,930,000 jointly and severally against all defendants. ER 38. The court also found that the Bureau was entitled to injunctive relief and ordered the parties to submit proposed terms for a permanent injunction. ER 40.

With respect to NBA's counterclaims, the court concluded that the claims "fail[ed] for lack of proof," as NBA did not present evidence indicating that the Bureau pressured NBA's banks, and it submitted "no evidence from the banks sufficient to establish the factual predicates for [its] counterclaims." ER 39-40. The court concluded that the evidence instead tended to support the conclusion that NBA's banking relationships "were already strained for reasons unrelated to any conduct by CFPB." ER 39.[6]

---

[6] NBA is mistaken in claiming that the district court "dismissed" its counterclaims and in requesting that this Court reverse the "dismissal of the Counterclaim." Br. 2, 5. The court did not dismiss the counterclaims but rather entered judgment on them. *See* ER 13.

After the parties filed their proposed terms for injunctive relief, Nationwide filed a motion for leave to file a motion for reconsideration of the district court's opinion and order. ER 402. On November 7, 2017 the district court denied Nationwide's motion on the ground that it satisfied none of the factors warranting reconsideration (such as the discovery of new evidence or a material change in the law) and also issued its judgment and permanent injunction. ER 402, 14-15, 7. Nationwide later filed post-trial motions under Rules 59 and 60, which the court denied on March 12, 2018. ER 1, 131, 145.

## SUMMARY OF ARGUMENT

### I. Nationwide's Appeal

Nationwide's oversize brief raises fifteen purported appellate issues and more than twenty additional sub-issues. Many of its arguments – some no longer than a sentence or two – are so lacking in legal reasoning and authority that Nationwide has arguably failed to offer the minimum necessary for adequate briefing. Others arguments raise issues with no bearing on what the district court actually found or held.

The hodgepodge of issues raised by Nationwide only underscores its inability to find any material error by the district court. In accordance with Fed. R. App. 28(a)(7), the Bureau offers a summary of its arguments in response to these various issues:

15

1) *Statute of limitations*:  Nationwide argues that the district court erred in concluding that the Bureau's claims were not time-barred but fails to identify any error in the court's factual findings establishing the timeliness of the Bureau's claims.

2) *Jury demand*:  Nationwide's argument that its delinquent jury demand entitled it to a jury trial ignores controlling legal authority that an untimely demand waives the right to a jury trial.

3) *Fair notice*:  Nationwide's argument that it lacked fair notice as to the meaning of "deceptive" under the CFPA misidentifies the appropriate standard for the review of economic regulation.  Consistent with controlling authority, the CFPA provides ample notice of the conduct it prohibits and satisfies the applicable notice standard.

4) *Meaning of "deceptive"*:  Nationwide's argument regarding the meaning of "deceptive" under the CFPA is foreclosed by the binding precedent of this Court.

5) *"Election" of remedies*:  Nationwide attempts to limit the remedies Congress authorized under the CFPA by proposing an interpretation of the statute inconsistent with its text and purpose.

6) *Penalty calculation*:  Nationwide's attempt to find error in the district court's penalty calculation addresses neither the supporting evidence

16

the Bureau presented at trial nor Nationwide's failure to offer any contrary evidence.

7) *Specificity of findings*:  Nationwide's claim that the district court's findings were inadequately specific is barred because, under the federal rules, Nationwide was required to request more specific findings from the district court before seeking such findings on appeal.

8) *Factual findings of CFPA violations*:  Nationwide's claims of clear error in five of the district court's factual findings misconstrue the court's stated basis and rationale for those findings.

9) *Meaning of "telemarketing"*:  Nationwide's argument that it did not engage in telemarketing ignores the overwhelming and uncontroverted evidence regarding Nationwide's massive telephone marketing campaign, as well as the plain meaning of telemarketing under the TSR.

10) *Application of the "stigma-plus" test*:  NBA claims that the district court misapplied the stigma-plus test for due process violations, but the district court's finding that Nationwide failed to prove the threshold element of stigma rendered further application of the test unnecessary.

11) *Evidentiary rulings*:  NBA's challenge to the district court's evidentiary rulings relies on a misconception of the scope of the hearsay exception

17

NBA seeks to rely upon, as well as a misapplication of that exception to the facts of this case.

12) *Expert witness ruling*:  NBA argues that the district court erred in excluding its purported expert but identifies no actual error by the district court and fails to address gross deficiencies in the witness's qualifications.

13) *Constitutionality of the Bureau's structure*:  Nationwide fails to provide adequate briefing of its constitutional argument and, regardless, the Bureau's structure is constitutional under controlling Supreme Court authority.

14) *Breadth of the injunction*:  The district court's injunction addresses the conduct underlying Nationwide's illegal practices and therefore is not overbroad.

15) *Cumulative error and request for new trial*:  Nationwide has not identified any cumulative error, misconstrues the notion of "cumulative error" as applied by other courts, and cannot explain why a new trial would be warranted to correct any such error.

## II. The Bureau's Cross-Appeal

The district court held that in the course of making false or misleading representations to consumers about its IM Program, Nationwide collected over

18

$73 million in fees from consumers. Yet the district court declined to require Nationwide to pay restitution of those fees, or any restitution whatsoever. That decision rested on erroneous legal principles and therefore must be reversed.

The district court's opinion was not entirely clear as to whether, based on its "balancing [of] the equities," it concluded that restitution was not appropriate *at all* or, instead, that the *amount* of restitution the Bureau sought was inappropriate. ER 36-67. Whichever of these two rationales explains the district court's decision, its denial of restitution was based on legal error.

First, to the extent the court declined, on equitable grounds, to award restitution at all, that denial was in error because the district court had no such discretion. The CFPA authorizes "any appropriate *legal or* equitable relief" for violations of the Act, 12 U.S.C. § 5565(a) (emphasis added), and here the Bureau sought legal restitution against Nationwide. Courts do not have discretion to deny legal relief based on equitable factors. Rather, if a plaintiff proves a violation and resulting harm, it is entitled to the legal relief that Congress has authorized. The Bureau undoubtedly made that showing here. Among other violations, the district court found that Nationwide engaged in illegal conduct that affected "all or virtually all" of its customers by giving the misleading impression that they could save thousands of dollars in the first years of the IM Program. The Bureau was therefore entitled to legal restitution to compensate consumers for the harm

resulting from this violation. Even assuming, *arguendo*, that a district court has equitable discretion to decline to award restitution, the court abused that discretion here by denying restitution for reasons incompatible with the underlying purpose of the statute.

Second, to the extent the district court denied restitution because it concluded that the *amount* that the Bureau sought was inappropriate, it misapplied this Court's precedent. This Court has established a two-step burden shifting framework for calculating restitution under the CFPA. Under that framework, the Bureau met its burden by establishing Nationwide's net revenues, which this Court has held serve as a reasonable approximation of a defendant's unjust gains. The burden then shifted to Nationwide to demonstrate that its net revenues overstated its unjust gains and that a lower restitution amount would therefore be appropriate. Nationwide adduced nothing in response and therefore did not meet that burden. Under this Court's precedent, the district court should then have awarded restitution. Its failure to do so warrants reversal and an award of restitution in the amount the Bureau established at trial.

# ARGUMENT

## I. Nationwide's Appeal

### A. Standard of Review

In light of the fifteen separate issues Nationwide raises in its brief, the Bureau addresses the applicable standard of review in each section below.

### B. The district court did not abuse its discretion in finding that Nationwide failed to prove its statute of limitations defense.

Nationwide appeals the district court's conclusion that Nationwide failed to prove its affirmative defense that the Bureau's claims were time-barred under the CFPA.[7]  Under the limitations provision of the CFPA, actions may not be brought "more than 3 years after the date of discovery of the violation to which an action relates."  12 U.S.C. § 5564(g)(1).  Relying on the Supreme Court's statute of limitations analysis in *Merck & Co. v. Reynolds*, the district court reasoned that limitations under the CFPA do not run until the Bureau "discover[s] or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation'" alleged in the Bureau's complaint, and concluded that Nationwide failed to prove that the Bureau discovered Nationwide's violations early enough to render its claims untimely.  ER 33 (quoting *Merck*, 559 U.S. 633, 634 (2010)).

This Court reviews a district court's application of a statute of limitations as a

---

[7] In its briefing on summary judgment the Bureau agreed, for the purposes of this action alone, that the district court's analysis of the statute of limitations under the CFPA could be applied to all claims in this action.  *See* ER 2361 n.4.

mixed question of law and fact reversible for clear error. *See Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1135 (9th Cir. 2006). Where, as here, a defendant raises a limitations defense to "bar rights of the Government," the statute of limitations "must receive a strict construction in favor of the government." *Badaracco v. Comm'r*, 464 U.S. 386, 391-92 (1984) (quoting *E.I. Du Pont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924)).

At trial Nationwide bore the burden of establishing the facts necessary to prove its affirmative defense. *Tovar v. U.S.P.S.*, 3 F.3d 1271, 1284 (9th Cir. 1993) ("In every civil case, the defendant bears the burden of proof as to each element of an affirmative defense."). Nationwide proposed two theories to prove that defense. First, it claimed that a single consumer complaint submitted to the Bureau in 2012 triggered the limitations period. Br. 29. Second, it claimed that the Bureau's former Director Richard Cordray had knowledge of Nationwide's violations that triggered the limitations period because, in his previous capacity as Attorney General of Ohio, he approved a settlement agreement between Ohio and Nationwide. Br. 32. As discussed below, the district court correctly found that Nationwide failed to prove its affirmative defense under either theory.

**1. The district court did not err in determining that the Bureau's receipt of a single consumer complaint did not constitute discovery of Nationwide's violations of the CFPA and TSR.**

On March 3, 2012 – three years and 69 days before the Bureau filed suit in this matter – the Bureau received a single-paragraph complaint from a consumer stating that Nationwide failed to provide the mortgage payment services it had promised, and that Nationwide tried to impose a "service charge" when the consumer terminated the program. ER 2650. The complaint did not mention any misrepresentations made by Nationwide in the mailers, telephone scripts, and other marketing materials at issue in the Bureau's complaint. Nor did it mention any other facts regarding the Bureau's claims, including the existence and amount of Nationwide's setup fee, representations about Nationwide's affiliation with lenders,[8] the amount and timing of interest savings, or consumers' ability to achieve savings through other programs. Although the consumer claimed that Nationwide "not only had misrepresented itself but also was deceptive in its business practice," the consumer's claim was based on Nationwide's failure to make the consumer's mortgage payments – not on misrepresentations made by Nationwide in marketing its IM Program. ER 2650.

---

[8] The consumer complaint states that the consumer "believ[ed] that Nationwide was affiliated with my mortgage company," but the complaint does not state that the consumer's belief was based on any misrepresentation by Nationwide. ER 2650.

The consumer complaint did not address any facts regarding the Bureau's claims, and thus its receipt by the Bureau could not constitute "discovery of the violation to which [the] action relates." 12 U.S.C. § 5564(g)(1). And, in any event, the consumer complaint mentioned neither Mr. Lipsky nor Loan Payment Administration LLC and therefore could not have put the Bureau on notice regarding their conduct.

Based on these facts, the district court concluded that the Bureau's receipt of the consumer complaint did not trigger the limitations period under the CFPA. *See* ER 32-33. "At most," the court stated, "a credible and specific consumer complaint might in some circumstances serve as a 'storm warning' and put the CFPB on 'inquiry notice' that it should begin investigating," but the Bureau still would have to "be in possession of sufficient facts to file suit" for the statute of limitations to begin running. ER 33 & n.22 (quoting *Merck*, 559 U.S. at 653). "Nothing in the record" suggested that the Bureau discovered such facts (or that "a reasonably diligent plaintiff" would have discovered such facts) in the 69-day period between the Bureau's receipt of the consumer complaint and the date three years prior to the filing of its action. ER 33.

Indeed, the court stated, had the Bureau "rushed into court" on the basis of a lone and unverified consumer complaint, its failure to make a reasonable inquiry "would have been a clear Rule 11 violation." ER 33 n.22; *see also* Fed. R. Civ. P.

24

11.  Under such circumstances, the notion that a single complaint could trigger discovery "is unsupported by any authority and would be unworkable."  ER 33. "Plainly," the district court concluded, "the statute was not yet running" in the two-month period between the Bureau's receipt of the consumer complaint and the relevant date for limitations purposes.  ER 33 n.22.

Nationwide does not (and cannot) establish that the court committed clear error in concluding that the meager facts in this one-paragraph consumer complaint were sufficient to constitute discovery of the violations alleged by the Bureau. Nationwide instead argues that the district court was required under *Merck* to conclude that the complaint triggered the running of the statute of limitations under § 5564.  Nationwide's argument constitutes a plan misreading of *Merck*.

*Merck* concerned claims under the Securities Exchange Act.  559 U.S. at 638, 648.  That Act provides that a claim is timely if filed within two years of "the discovery of the facts constituting the violation."  28 U.S.C. § 1658(b).  The Court concluded that because scienter constitutes "an important and necessary element" of a violation under the Securities Exchange Act, it constitutes one of the "facts constituting the violation" that must be discovered before the limitations period begins to run.  *Id.* at 649-53.  The Court stated that events that might constitute "inquiry notice" or "storm warning[s]" do not constitute "discovery of the facts" under the Act, and instead can only indicate a time when facts might have

25

"prompted a reasonably diligent plaintiff to begin investigating." *Id.* at 653. The limitations period, however, "does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Id.*

Consistent with this analysis, the district court concluded that the barebones complaint received by the Bureau could not trigger the limitations under the CFPA and that, "at most," a (different) complaint might conceivably "put the Bureau on 'inquiry notice.'" ER at 33 (quoting *Merck*, 559 U.S. at 653). Nationwide nevertheless claims that, because the Bureau's claims lack a scienter requirement, "the only knowledge required is the existence of the practices themselves." Br. 35. But Nationwide's focus on scienter under the Securities Exchange Act ignores the fact that the consumer complaint received by the Bureau did not even mention the practices that underlie the Bureau's claims in this case under the CFPA. As noted above, the complaint focused on Nationwide's "service charge" and made no mention of the misrepresentations the Bureau later alleged. The complaint therefore did not even put the Bureau on inquiry notice of the relevant practices, let alone amount to actual "discovery" of those practices.

In any event, even assuming that the inquiry-notice standard applies to the government, and even assuming that the single consumer complaint here put the Bureau on inquiry notice, that complaint did not itself trigger the limitations

26

period. ER 33. To show that the Bureau "discovered" the violations, Nationwide had to show at trial that the Bureau actually discovered (or that a reasonably diligent plaintiff would have discovered) Nationwide's violations of the CFPA and TSR in the 69-day timeframe at issue in the limitations period here. ER 33. But as the district court noted, Nationwide failed to put on any such evidence. "Even assuming" that the consumer complaint obligated the Bureau "to begin investigating," the court found that "[n]othing in the record suggests that CFPB actually discovered the facts, or that a reasonably diligent plaintiff would have discovered" such facts in the 69 days between the Bureau's receipt of the consumer complaint and the date three years prior to filing. ER 33. Having put on no such evidence at trial, and having raised no such issue in its brief, Nationwide cannot establish any error in the district court's finding that Nationwide failed to establish facts necessary to prove its affirmative defense.

> **2. The district court did not err in concluding that the limitations period under the CFPA did not begin running as a result of a settlement agreement the Bureau's former Director approved in his prior role as a state official.**

Nationwide also argues that the Bureau's former Director, Richard Cordray, in his prior capacity as Ohio Attorney General, gained knowledge of Nationwide's violations under the CFPA sufficient to trigger the limitations period, and that such knowledge could be imputed to the Bureau for limitations purposes. The district court did not reach the question of imputation, as it resolved the issue on factual

grounds by finding that Nationwide had "not shown that the Ohio Attorney General's office in 2010 had knowledge of the matters on which the CFPB's claims in this action are based." ER 32 n.21.

Nationwide cannot establish that the district court's finding on this factual issue constitutes clear error. Nationwide's sole piece of evidence on this question – a settlement agreement signed in January 2010 – does not show that Mr. Cordray (or the Ohio Attorney General's Office generally) had any knowledge of Nationwide's conduct at issue in this case. Nor could it: even if the settlement agreement addressed topics similar to those later addressed in the Bureau's complaint, the settlement agreement was signed in February 2010. *See* ER 1438. The Bureau's claims concern Nationwide's conduct in 2011 and beyond. *See, e.g.*, ER 34, 32 n.21. Nationwide cannot show that upon joining the Bureau Mr. Cordray had knowledge of Nationwide's practices in that timeframe, or that he knew that the problematic practices addressed by the Ohio Attorney General's Office had not come to an end. *See, e.g.*, ER 32 at n.21 (noting that the change to Nationwide's setup fee at issue in the Bureau's case "did not occur until 2011").

Nationwide's argument boils down to the unworkable proposition that once a former state official joins a federal agency, the agency is required – lest limitations periods inadvertently begin to run – to investigate all entities of which the official had knowledge to determine whether the entity's *present* conduct

28

violates federal law. Such a narrow and unworkable interpretation of the limitations period under the CFPA would run afoul of the Supreme Court's mandate that limitations "must receive a strict construction in favor of the government." *Badaracco*, 464 U.S. at 391-92.

### 3. Nationwide's remaining arguments regarding the CFPA's statute of limitations are without merit and, regardless, would not affect the district court's rulings.

In its brief Nationwide raises various additional arguments regarding the statute of limitations that were not addressed by the district court in its determination that Nationwide failed to prove its affirmative defense. *See, e.g.*, Br. 17-29. For instance, Nationwide devotes extended discussion to the meaning of "discovery" under § 5564(g)(1) and the other statutes that incorporate a date of discovery, despite the fact that the district court had no need to opine on the meaning of the term for purposes of this case. As the Supreme Court cautioned in *Gabelli v. SEC*, determining, for limitations purposes, when the government discovers a particular act "presents particular challenges for the courts." Br. 23 (quoting *Gabelli*, 568 U.S. 442, 452 (2013)). The Court in *Gabelli* explained that limitations questions are especially difficult to resolve in the context of government enforcement actions because they require courts to address the interplay among complex questions regarding statutory interpretation, the structure of federal agencies, and the assertion of government privileges. *Gabelli*, 568 U.S.

29

at 452-53.  The district court had no need to address (let alone resolve) such questions in concluding that, as a factual matter, Nationwide failed to prove either of the two theories supporting its limitations defense.  This Court should decline Nationwide's invitation to opine on these legal issues not necessary for the resolution of this appeal.[9]

## C. The district court did not err in striking Nationwide's delinquent jury demand.

Federal Rule of Civil Procedure 38(b) provides that a party may demand a jury trial by "serving the other parties with a written demand – which may be included in a pleading – no later than 14 days after the last pleading directed to the

---

[9] Among its various arguments Nationwide argues that any ambiguity under § 5564 must be construed in its favor because, according to Nationwide, the CFPA is a "penal statute" and subject to the rule of lenity.  As with Nationwide's other extraneous legal arguments, the court need not reach this question as it is not necessary for determining whether the district court committed clear error in its findings that Nationwide failed to prove its affirmative defense.  In any event, Nationwide cites no provision in the CFPA nor any legal argument or authority supporting its conclusory characterization of the CFPA as a "penal statute" and therefore has waived any such argument on appeal.  Moreover, Nationwide has not shown any ambiguity in § 5564 requiring resolution by the district court or this Court, let alone the kind of "grievous ambiguity" for which the rule of lenity is reserved.  *See Barber v. Thomas*, 560 U.S. 474, 488 (2010).  Even if there were any such statutory ambiguity requiring resolution (which there is not), the rule of lenity is a rule of construction applied in the context of *criminal* conduct.  It therefore "does not generally apply to a civil statute."  *United States v. Turner*, 689 F.3d 1117, 1125 (9th Cir. 2012).  Exceptions in which the rule is applied in the civil context involve statutes that, unlike the CFPA, are "intertwin[ed]' with criminal provisions.  *Id.  See also United States v. Santos*, 553 U.S. 507, 523 (2008) (noting that Court had ruled in favor of civil defendant "because the statute had criminal applications that triggered the rule of lenity.").

issue is served." Under Rule 38(d), "[a] party waives a jury trial unless its demand is properly served and filed." The filing of an amended pleading "d[oes] not revive" the right to demand a jury trial as to the issues raised in the original pleading. *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1066 (9th Cir. 2005). This Court reviews a district court's ruling regarding the timeliness of a jury trial demand for strict adherence with Rule 38. *Russ v. Standard Ins.* Co., 120 F.3d 988, 990 (9th Cir. 1997) (noting the "specific prohibition on district courts granting jury trials where the parties have failed to comply with Rule 38").[10]

The district court did not err in concluding that, under Rule 38(b), Nationwide waived its right to a jury trial by filing a delinquent jury demand. On July 13, 2015 Nationwide filed its answer to the Bureau's complaint. ER 2901. Because Nationwide's answer was the "last pleading directed to such issue" within the meaning of Rule 38(b), Nationwide had until July 27, 2015 to serve a jury demand.[11] But Nationwide waited until August 10, 2015 – 14 days *after* its

---

[10] Nationwide argues that the "district court's decision to conduct a bench trial is reviewed for an abuse of discretion." But the case it cites is inapt. *See* Br. 35 (citing *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 419 (9th Cir. 1998)). *Cigna* merely noted that where a plaintiff brought an equitable rescission claim and the defendant brought a counterclaim for which it requested a jury, the district court "had the discretion to first conduct a bench trial on the [plaintiff's] equitable rescission claim." *Cigna*, 159 F.3d at 419. In any event, as discussed below, a district court's discretion to grant an untimely jury demand is limited to motions under Rule 39(b), and Nationwide never filed any such motion.

[11] *See Pac. Fisheries*, 239 F.3d at 1002 n.2 (defendants' answer was the "last pleading directed to such issue").

deadline under Rule 38 – to serve the Bureau the jury demand contained in its

amended answer. *See* ER 2875, 2890. The amended answer contained no new

issue that could have revived the 14-day time period under Rule 38(b)(1), nor did

Nationwide argue that its amended answer contained any such issue. *See* ER 55

n.1 (citing *Lutz*, 403 F.3d at 1066). Therefore, by failing to file and serve its

demand within the time provided under Rule 38, Nationwide waived whatever

right it had to a jury trial in this matter.

Rather than address its waiver under Rule 38, Nationwide offers a non

sequitur, stating that the Bureau asked Nationwide to file an amended answer

removing certain affirmative defenses. *See* Br. at 68.[12] But any such efforts are

not relevant under Rule 38, as the rule does not require that a party file its jury

demand simultaneously with an answer, amended answer, or any other pleading.

Rather, Rule 38(b) provides that a jury demand "*may* be included in a pleading"

(emphasis added). Nationwide cites no authority in support of its assertion that an

opposing party's request to file an amended pleading could alter the deadline under

Rule 38(b). Whether by choice or mere inadvertence, Nationwide did not file a

jury demand within the timeframe mandated under Rule 38(b). It therefore waived

any right to a jury trial in this matter. *See Russ*, 120 F.3d at 990.

---

[12] The Bureau made the request as part of an effort to avoid having to file a motion
to strike Nationwide's affirmative defenses. *See* ER 2891-92.

Nationwide makes four other arguments in an attempt to resurrect its jury demand, but none alters the fundamental fact of its waiver under Rule 38.  First, Nationwide appeals to the fundamental right to a jury trial.  But even fundamental rights are subject to waiver.  As the Supreme Court has stated, "[n]o procedural principle is more familiar to this Court than that a constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."  *United States v. Olano*, 507 U.S. 725, 731 (1993) (quotation and citation omitted).  Consistent with this principle, this Court has concluded that "[t]here is no dispute that the Seventh Amendment right to a jury trial, like other constitutional rights, can be waived."  *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1530 (9th Cir. 1995), *as amended* (Apr. 24, 1995) (citing *United States v. Moore*, 340 U.S. 616, 621 (1951)).  Moreover, this Court has held that "[t]he waiver provisions of Rule 38 are constitutional."  *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 674 (9th Cir. 1975).  Nationwide's appeal to the fundamental nature of the jury trial right is therefore not relevant in determining whether it waived that right.

Second, Nationwide argues that the filing of its amended answer reset the 14-day deadline under Rule 38.  The district court rejected that argument, applying this Court's holding in *Lutz* that, once the 14-day time limit under Rule 38 has

passed, an amended pleading "d[oes] not revive" the right to demand a jury as to the issues raised in the original pleading. *Lutz*, 403 F.3d at 1066 (vacating verdict where district court mistakenly believed that amended pleading restarted time to demand a jury); ER 55 n.1. Only when an amendment presents "a new issue on which a jury trial should be granted" under Rule 38(b) can a pleading restart the time to demand a jury trial, and only if such new issues present questions of fact. *Id.*; *Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 620 (9th Cir. 1979) (adding new theories of recovery in amended complaint does not restart time to demand a jury because "the issues in the original complaint and the amended complaint turn on the same matrix of facts"). As the district court noted, Nationwide "d[id] not, and could not, make any argument" that its amended answer raised any such new issue. ER 55 n.1. Nationwide therefore lacks any basis for arguing that its amended complaint reset the 14-day deadline under Rule 38.

Third, Nationwide cites this Court's statement that "courts should indulge every reasonable presumption against waiver." *See* Br. at 69 (citing *Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981)). But this Court has applied that presumption in circumstances where the party in question has – unlike Nationwide – already made a proper jury demand under Rule 38(b) and thereafter acts in ways suggesting waiver. For example, this Court has held that waiver may

34

be presumed where a party makes a proper jury demand but then participates in a full bench trial without objection; in contrast, waiver cannot be presumed where a party properly requests a jury but then fails to file jury instructions. *Compare White v. McGinnis*, 903 F.2d 699, 700, 703 & n.10 (9th Cir. 1990), *with Solis v. Cty. of Los Angeles*, 514 F.3d 946, 954-45 (9th Cir. 2008). *See also Pradier*, 641 F.2d at 811 (error to presume waiver where party did not comply with local rule regarding notation of jury demand). Unlike the parties in these cases, NBA never made a timely jury demand. The presumption against waiver therefore does not apply.

Finally, Nationwide argues that it should have been granted a jury trial because of the timing of the Bureau's motion to strike, which it filed after the district court denied summary judgment.[13] But courts have wide discretion in considering motions to strike jury demands, regardless of when they are filed.[14]

---

[13] The Bureau provided notice of its intent to file a motion to strike more than four and a half months before trial, advising Nationwide and the district court that it "anticipate[d] filing a motion to strike Defendants' jury demand because that demand was untimely." *See* SER 50. The Bureau ultimately filed its motion to strike ten days after the district court denied the parties' cross-motions for summary judgment, and more than two months before trial. *See* ER 1976. Moving to strike the jury demand at an earlier date would have been inefficient, as the court's ruling on summary judgment could have rendered the motion unnecessary.

[14] *See, e.g.*, *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226-27 (3d Cir. 2007) ("a court has the discretion to permit a motion to strike a jury demand at any time, even on the eve of trial"); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1158 (5th Cir. 1982) (affirming district court's granting of motion to strike jury demand on eve of trial). *See also* 8 Moore's Federal Practice - Civil § 39.13

Regardless, the Fifth Circuit case Nationwide cites in support of its argument demonstrates why its argument fails. *See* Br. at 69 (citing *Daniel Int'l Corp. v. Fischbach & Moore, Inc.*, 916 F.2d 1061, 1064-66 (5th Cir. 1990)). The defendant in *Daniel* – like Nationwide here – filed a delinquent jury demand and therefore, the Fifth Circuit concluded, "waived its right to demand a jury trial under Rule 38(b)." *Daniel Int'l Corp.*, 916 F.2d at 1063. The defendant's waiver under Rule 38 would have ended the Fifth Circuit's inquiry, but for the fact that – unlike Nationwide – the defendant in *Daniel* later filed a motion under Rule 39(b), which provides that, notwithstanding a party's failure to properly demand a jury trial, "the court in its discretion *upon motion* may order a trial by a jury of any or all issues." *Id.* at 1064 (emphasis added).[15] Nationwide filed no such motion under 39(b) in the district court.[16] *Daniel* therefore offers no support for Nationwide's argument.

---

(2018) ("Parties have a great deal of latitude on the timing of motions to strike a jury demand."). Although, as discussed below, these cases necessarily address a district court's discretion under Rule 39, they establish that courts are authorized to strike jury demands well after the pleading stage.

[15] The language quoted here is from the version of Rule 39(b) quoted by the court in *Daniel* in 1990. The current version of Rule 39(b) is substantially similar, stating that "the court may, on motion, order a jury trial on any issue for which a jury might have been demanded."

[16] In its opposition to the Bureau's motion to strike, Nationwide requested that, under Rule 39(c), the court exercise its discretion to empanel an advisory jury for purposes of NBA's counterclaims. ER 1964. But Nationwide did not request that the court exercise its discretion to order a jury trial under Rule 39(b). *See id.*

Even if Nationwide had filed a motion under Rule 39(b) (which it did not), the district court would have been bound under this Court's precedents to deny the motion unless "some cause beyond mere inadvertence [was] shown" by Nationwide. *Pac. Fisheries Corp. v. HIH Cas. & Gen. Ins., Ltd.*, 239 F.3d 1000, 1002 (9th Cir. 2001). *See also* ER 55 (noting the "well-settled" law under *Pacific Fisheries Corp.* that district courts have discretion to excuse untimely jury demands "only in very limited circumstances"); *Lutz*, 403 F.3d at 1065 n.4 (court would have abused its discretion by granting 39(b) motion where party made "no explanation other than inadvertence"). The district court concluded that Nationwide could not have met that standard, as Nationwide "offered no evidence, or even argument," that its failure was "anything other than oversight or inadvertence." ER 56.

None of Nationwide's arguments can overcome the fundamental fact that it waived whatever right it had to a jury trial by failing to comply with Rule 38. And even if Nationwide had sought the district court's discretion to order a jury trial under Rule 39, it failed to make the showing necessary to warrant the court's exercise of that discretion. Accordingly, and in light of this Court's "specific prohibition on district courts granting jury trials where the parties have failed to comply with Rule 38," the district court lacked authority to excuse Nationwide's untimely jury demand. *Russ*, 120 F.3d at 990.

**D. The well-established meaning of "deceptive" under the CFPA provides fair notice for due process purposes.**

Nationwide claims that the CFPA does not provide fair notice of the conduct it prohibits and therefore violates due process. "Whether a statute or regulation is unconstitutionally vague is a question of law reviewed de novo." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013). Unlike criminal statutes, "economic regulation is subject to a less strict vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); *accord Ass'n des Eleveurs*, 729 F.3d at 946.

Rather than address the less strict vagueness test applicable to economic regulation, Nationwide instead relies on cases addressing vagueness challenges to criminal statutes.[17] The *Johnson* case on which Nationwide relies involved the definition of "violent crime" under the Armed Career Criminal Act (ACCA), and the *Dimaya* case simply applied the reasoning of *Johnson* in construing a statute that incorporated similar language in defining the meaning of "crime of violence."

---

[17] Nationwide also cites, without explanation, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012). Although Nationwide offers no discussion of the case, it nevertheless is inapplicable because it addressed due process concerns regarding penalties imposed under retroactively applied guidelines. *See Fox Television*, 567 U.S. at 254. In contrast, the Bureau did not levy any administrative penalties on Nationwide (retroactive or otherwise); they were imposed by a court based on evidence and arguments presented at trial. More fundamentally, there are no retroactivity concerns here. The CFPA was passed in July 2010 and became effective July 21, 2011. *See* 75 Fed. Reg. 57,252 (Sept. 20, 2010). The Bureau only sought, and the Court only imposed, civil money penalties based on Nationwide's acts and practices starting July 21, 2011. *See* ER 37-38.

*See Johnson v. United States*, 135 S. Ct. 2551 (2015); *Dimaya v. Lynch*, 803 F.3d 1110, 1111 (9th Cir. 2015). Neither case stands for the proposition that a civil statute regulating economic conduct is subject to the void-for-vagueness standard applicable to criminal laws.

Nationwide's argument is also inconsistent with this Court's conclusion that the term "deceptive act or practice" as used under the CFPA "has an established meaning in the context of the Federal Trade Commission Act," a meaning which this Court expressly adopted in construing the CFPA in *CFPB v. Gordon*. 819 F.3d 1179, 1193 n.7 (9th Cir. 2016).[18] Numerous courts in this circuit have cited *Gordon* in rejecting other fair notice challenges to the CFPA. *See, e.g.*, *CFPB v. Think Fin., LLC*, No. CV-17-127-GF, 2018 WL 3707911, at *3 (D. Mont. Aug. 3, 2018) (citing *Gordon* in concluding that "[t]he CFPA provides fair notice that it prohibits 'unfair, deceptive, or abusive act[s] or practice[s].'"); *CFPB v. D & D Mktg., Inc.*, No. CV 15-9692-PSG, 2017 WL 5974248, at *5 (C.D. Cal. Mar. 21, 2017) ("there is little doubt that fair notice is satisfied, given the links between the CFPA and the FTCA") (citation omitted); *CFPB v. CashCall, Inc.*, No. CV-15-

---

[18] Although Nationwide quotes the CFPA's prohibition on "unfair, deceptive, or abusive acts or practices," its fair notice argument addresses only the prohibition on deceptive conduct under the CFPA and its relation to the FTC Act. *See* Br. 40 (quoting 12 U.S.C. § 5536(a)(1)(B)). Because Nationwide makes no fair notice argument regarding the CFPA prohibition on abusive conduct, any such argument is waived. *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.").

7522-JFW, 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016) (rejecting defendants' fair notice argument "especially in light of the CFPA's use of language or terms that have established meanings under other consumer-protection statutes").

Nationwide's challenge to the binding precedent of *Gordon* goes even further, as it questions the deception standard this Court adopted from well-established FTC case law. *See Gordon*, 819 F.3d at 1193 & n.7. That challenge is not apparent from the face of Nationwide's brief, as Nationwide quotes the deception standard applied by the district court but fails to acknowledge – by way of a "citation omitted" reference – that the district court was quoting this Court in *Gordon* itself. *See* Br. 40 (quoting ER 21). Nationwide then challenges the *Gordon* standard by claiming – without explanation – that it somehow requires judges to "imagine" a "hypothetical" reasonable consumer, and that the district court erred by failing to consider "actual" consumers. *See* Br. at 40-42. Nationwide supports none of these straw-man claims with citation to any legal authority showing error by the district court. Nor could it, as this Court's deception standard in *Gordon*, rooted in decades of FTC case law, constitutes binding precedent in this circuit. *See Gordon*, 819 F.3d at 1193 n.7.

Finally, Nationwide argues that "fair notice does not arise in the context of actions brought by the FTC" because the FTC Act provides for penalties only after

40

violation of an administratively issued order.  Br. 42.  But that statutory provision
is not rooted in fair notice requirements, as the FTC Act also permits the
Commission to seek monetary remedies and other injunctive relief for FTC
violations in court without issuing any such administrative order.  *See, e.g., FTC v.*
*Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (courts may grant
restitution and other remedies in cases brought under 13(b) of the FTC Act).
Nationwide offers no authority suggesting that the FTC Act requires that before
bringing an action in court – even actions seeking restitution and other monetary
remedies – the FTC must first, for fair notice purposes, comply with procedures
that apply only in the administrative context.

### E. This Court has already established the meaning of "deceptive" under the CFPA.

In a further challenge to this Court's precedents, Nationwide claims that the
district court erred in applying the meaning of the term "deceptive" under the
CFPA – an issue that, as noted above, this Court resolved in *Gordon*.[19]  819 F.3d at
1193 & n.7; *see* Part I.D, *supra*.  As this Court has stated, "[o]nce a panel resolves
an issue in a precedential opinion, the matter is deemed resolved, unless overruled
by the court itself sitting en banc, or by the Supreme Court."  *Hart v. Massanari*,

---

[19] A district court's interpretation of a statute is reviewed de novo.  *United States v.*
*Migi*, 329 F.3d 1085, 1087 (9th Cir. 2003).  For the reasons stated below, that
standard does not apply where, as here, a party is asking this Court to disregard its
own binding precedent.

266 F.3d 1155, 1171 (9th Cir. 2001). The three-judge panel hearing this matter

therefore must "apply the earlier-adopted rule; it may not any more disregard the

earlier panel's opinion than it may disregard a ruling of the Supreme Court." *Id.*

Nationwide does not dispute that the district court relied on the CFPA

standard for deception established under *Gordon*. *See* Br. 44 (citing ER 21). That

standard was binding on the district court, and it is binding here. In *Gordon*, this

Court resolved an appeal by adopting the deception standard it previously

announced for claims under the FTC Act in *FTC v. Pantron I Corp.*, which itself

was based on the deception standard established by the FTC in *Cliffdale*

*Associates*. *See Gordon*, 819 F.3d at 1192-93 (citing *Pantron I*, 33 F.3d 1088,

1095 (9th Cir. 1994) (citing *Cliffdale Assocs.*, 103 F.T.C. 110 (1984))).[20] The

*Gordon* court explained its rationale for adopting this standard in a footnote,

stating that "the term 'deceptive act or practice' has an established meaning in the

context of the [FTC Act], and Congress used very similar phrasing

in § 5536(a)(1)(B)." *Id.* at 1193 n.7.

Where, as here, "a panel confronts an issue germane to the eventual

resolution of the case, and resolves it after reasoned consideration in a published

---

[20] Under the standard adopted by *Gordon*, an act or practice is deceptive under the
CFPA if: "(1) 'there is a representation, omission, or practice that,' (2) 'is likely to
mislead consumers acting reasonably under the circumstances,' and (3) 'the
representation, omission, or practice is material.'" *Gordon*, 819 F.3d at 1192-93
(quoting *Pantron I*, 33 F.3d at 1095).

opinion, that ruling becomes the law of the circuit." *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc). Accordingly, the only basis for challenging the binding precedent of *Gordon* would be the existence of contrary intervening authority, such as a subsequent en banc decision, a Supreme Court decision, or intervening legislation. *See FDIC. v. McSweeney*, 976 F.2d 532, 535 (9th Cir. 1992) ("As a three-judge panel, we are bound by our prior decisions interpreting state as well as federal law in the absence of intervening controlling authority."). Nationwide offers no such authority. Its argument for ignoring the deception standard adopted in *Gordon* relies on what it describes as "numerous important legal issues," none of which constitute intervening authority – much less authority warranting reconsideration of this Court's binding precedent. Br. 44. In the absence of any such authority, this Court should, of course, follow its own precedent and reject Nationwide's argument. *See Hart*, 266 F.3d at 1171.

## F. The CFPA does not require the Bureau to choose between legal and equitable relief.

If a person violates a Federal consumer financial law,[21] the CFPA authorizes the Bureau to "commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a). Nationwide

---

[21] "Federal consumer financial law" is defined under the CFPA and includes the statutes and rules at issue in the violations alleged in the Bureau's complaint against Nationwide. *See* 12 U.S.C. § 5481.

argues that the "or" in the phrase "to impose a civil penalty or to seek all appropriate legal and equitable relief" must be read disjunctively – thus requiring the Bureau to seek either "a civil penalty" or other "legal and equitable relief," but not both. The district court rejected Nationwide's proposed interpretation of § 5564, noting that "in context [the statute] plainly is listing non-exclusive options CFPB is permitted to pursue." ER 34 n.25. This Court reviews de novo the district court's interpretation of a statute. *See Migi*, 329 F.3d at 1087.

Nationwide's argument does not withstand scrutiny of either the text or purpose of the CFPA. Textually, the error in Nationwide's interpretation is made apparent by the plain language of the section that immediately follows § 5564. Whereas § 5564 (entitled "Litigation Authority") establishes the general contours of the Bureau's litigation authority, § 5565 ("Relief Available") lists various remedies the Bureau may pursue in exercising that authority. If Nationwide were correct that § 5564 required the Bureau to choose between civil penalties and other remedies, the remedies in § 5565 would reflect that division. Section 5565 does precisely the opposite. It instead enumerates a list of remedies which includes (with an unambiguous "and") civil money penalties, and further states that the Bureau may pursue all such remedies "without limitation":

> (2) Relief
> Relief under this section may include, *without limitation*--
> (A) rescission or reformation of contracts;

44

> (B) refund of moneys or return of real property;
> (C) restitution;
> (D) disgorgement or compensation for unjust enrichment;
> (E) payment of damages or other monetary relief;
> (F) public notification regarding the violation, including the costs of notification;
> (G) limits on the activities or functions of the person; *and*
> (H) *civil money penalties*, as set forth more fully in subsection (c).

12 U.S.C. § 5565(2) (emphasis added). As the district court noted, this inclusive list of remedies in § 5565 cannot be reconciled with Nationwide's narrow interpretation of § 5564. *See* ER 34 n.25 (the non-exclusive meaning of "or" in § 5564 "is confirmed by the listing of the available remedies set out in § 5565(a)").[22]

Rather than address this internal contradiction in its argument, Nationwide instead argues that because the "ordinary use" of the term "or" is "almost always disjunctive," that meaning necessarily applies here. *See* Br. 52 (citing *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014)). But "[t]he word 'or' is frequently construed to mean 'and,' and vice versa[.]" *Dumont v. United States*, 98 U.S. 142, 143 (1878). As a result, "courts are often compelled to construe '*or*' as meaning '*and*'" in order to "ascertain the clear intention of the legislature." *United States v.*

---

[22] Given that § 5564 expressly grants the Bureau broad authority to determine the remedies it will seek, Congress may have elected to use an "or" in § 5565 to make clear the Bureau's discretion in determining whether to seek civil penalties. If § 5565 stated that the Bureau could commence an action "to impose a civil penalty *and* to seek all appropriate legal and equitable relief," the provision could have been misinterpreted as obliging the Bureau to always seek civil penalties whenever it seeks legal and equitable relief. The "or" in § 5565 avoids such a misreading.

45

*Fisk*, 70 U.S. 445, 447 (1865). *See also De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."). The contradiction created by Nationwide's interpretation ignores these precepts of statutory interpretation and thus violates "the cardinal rule that a statute is to be read as a whole," as well as the maxim that courts should "adopt that sense of words which best harmonizes with context and promotes policy and objectives of legislature." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 & n.10 (1991) (citations omitted).

Nationwide's interpretation also cannot be reconciled with the remedial purpose of the CFPA, under which Congress consolidated in the Bureau regulatory and enforcement powers over numerous federal statutes that protect consumers. *See* 12 U.S.C. § 5481(12), (14); *id.* § 5491. As the various remedial provisions under § 5565 demonstrate, Congress intended to provide the Bureau a wide range of options for remediating consumers and preventing further wrongdoing. Given that express purpose, it would defy common sense to conclude that the massive restriction on the Bureau's remedial authority proposed by Nationwide would be hidden in the proverbial mousehole. *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

### G. The district court did not err in its civil penalty calculation, particularly where Nationwide offered no evidence to challenge that calculation.

Nationwide's argument that the district court erred in its penalty calculations ignores the evidence the Bureau presented in support of that calculation – as well as Nationwide's decision to offer no evidence that might challenge that calculation or support a mitigated penalty. The civil penalty provisions under the CFPA set out five mitigating factors for courts to consider in determining a penalty, including "the size of financial resources" of the person who violated the Act. 12 U.S.C. § 5565(c)(3)(A). A district court's decision on civil penalties is reviewed for abuse of discretion. *Fed. Election Comm'n v. Ted Haley Cong. Comm.*, 852 F.2d 1111, 1116 (9th Cir. 1988).

The Bureau presented evidence at trial regarding defendants' financial resources, including evidence from which the district court concluded that Nationwide received $73,955,169 in revenue from consumers' setup fees and that Mr. Lipsky received $33,039,299 in shareholder distributions. ER 34-35. At trial Nationwide presented no evidence and raised no argument suggesting that the Bureau's evidence did not represent a basis for inferring defendants' financial resources, current or otherwise. ER 35. Based on the Bureau's evidence, the district court imposed a civil penalty of $7,930,000 against all defendants jointly and severally. ER 38.

47

After trial, and after the district court issued its findings of fact and conclusions of law, Nationwide filed a motion for reconsideration arguing – for the first time – that at trial the Bureau bore the burden to put on evidence regarding mitigating factors under § 5565 and that it failed to meet that burden. It also argued for the first time that the court's penalty calculation should have excluded weekends and holidays. The district court found that "none of the arguments [defendants] seek to present" met any of the factors that might warrant reconsideration, such as the discovery of new evidence or a material change in the law.[23] ER at 14-15. The court therefore denied Nationwide's motion for reconsideration. *See id.*

"A challenge to a denial of a motion for leave to file a motion for reconsideration brings up just the denial of that motion, not the underlying merits." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1239 (9th Cir. 2017). Nationwide therefore must establish that the district court abused its discretion in

---

[23] As the district court noted, the local rule under which Nationwide sought reconsideration provides that a party may seek reconsideration by showing (1) "a material difference in fact or law" that the party did not know despite "the exercise of reasonable diligence," (2) "the emergence of new material facts or a change in law," and (3) a "manifest failure" by the court to consider previously presented material facts or dispositive legal arguments. N.D. Cal. Civ. R. 7-9. These factors regarding motions for reconsideration are consistent with those recognized by this court. *See Nunes*, 375 F.3d at 807 ("Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law.").

denying its motion for reconsideration before it can argue the merits of the issues raised in that motion. *Nunes v. Ashcroft*, 375 F.3d 805, 807 (9th Cir. 2004) (decision on a motion for reconsideration is reviewed for abuse of discretion). Nationwide offers no such argument in its brief and therefore has waived this issue on appeal. *See Graf*, 610 F.3d at 1166.

Yet even if Nationwide had challenged the district court's motion for reconsideration (which it has not), Nationwide's arguments would fail on the merits, as the district court concluded in an alternative holding. ER at 14-15. First, on the question of mitigating factors, the district court explained that the Bureau presented evidence sufficient to make a determination regarding Nationwide's financial resources. The Bureau "presented uncontroverted evidence regarding the revenues defendants' business generated," as well as "evidence of the amounts paid out in shareholder distributions." *Id.* Even if that evidence "may not have established the amount of defendants' financial resources with precision," the court concluded, "it was sufficient to support inferences leading to the conclusion that a reduction in the penalty calculation on the basis of financial resources was not warranted." *Id.* Nationwide offered no evidence at trial to challenge the Bureau's evidence regarding Nationwide's financial resources, and the court's findings based on that uncontroverted evidence was hardly an abuse of discretion. The district court also rejected the argument that it lacked discretion to impose a

penalty commensurate Nationwide's size at the time the company was engaging in wrongful conduct, noting that a reduction in penalties was not justified "merely because they contend subsequent events have depleted their resources."[24]

Second, on the question of whether the district court's penalty calculation should have included weekends or holidays, the court's order contradicts Nationwide's assertion that there was "no such evidence" to support its inclusion of such days. Br. 57. Citing evidence regarding Nationwide's telemarketing practices, the court concluded that it would be "surprising" if such violations did *not* occur on such days. ER 16 n.2. Nationwide offered no evidence at trial to challenge such an inference, nor does Nationwide offer on appeal any argument that the district court's reliance on the uncontroverted evidence at trial constituted an abuse of discretion.

Even if Nationwide had offered evidence that might challenge the inference that its violations occurred on weekends and holidays (which it did not offer), the

---

[24] Nationwide does not challenge this conclusion and instead asserts that "financial resources" under § 5565 means a defendant's financial resources at the time the penalty is imposed. The only legal authority Nationwide cites for its argument is an inapplicable California state appellate decision that discusses a "rule established by lower California [state] courts." *See* Br. at 54; *Boyle v. Lorimar Prods., Inc.*, 13 F.3d 1357, 1361 (9th Cir. 1994). Nationwide does not explain how a California state court opinion construing California state law is relevant in construing the civil penalty provisions of the CFPA. Even if Nationwide's argument were correct, the district court found the evidence at trial sufficient to make an inference regarding defendants' financial resources, and Nationwide offered nothing to suggest that the evidence did not reflect its current resources. *See* ER 15.

district court recognized that the violations alleged by the Bureau concerned ongoing marketing practices, not merely individual acts regarding individual calls on individual days. *See, e.g.*, ER at 20-21 (noting that the CFPA applies to an "act *or* practice," and that a "representation *or* practice" might be misleading under the Act) (emphasis added). Nationwide offers no argument that its ongoing practices and resulting misrepresentations to consumers were somehow rectified on weekends and holidays.

Of course, this Court need not reach any of these merits arguments, as Nationwide failed to challenge the district court's denial of the motion for reconsideration in which Nationwide first raised these issues. *See Wendell*, 858 F.3d at 1239. Having failed to argue that the district court abused its discretion in denying that motion, Nationwide has waived any such argument on appeal. *See Graf*, 610 F.3d at 1166.

## H. Because Nationwide did not move the district court to amend its findings under Fed. R. Civ. P. 52(b), Nationwide cannot challenge the adequacy of those findings on appeal.

Nationwide argues that the district court failed to comply with Fed. R. Civ. P. 52(a) because it "failed to provide a reasoned explanation for several findings in this case."[25] Br. 57. As this Court has held, on appeal a party cannot "complain of the lack of specificity" in a district court's findings if the party "failed to move the

---

[25] This Court reviews a district court's factual findings under Rule 52(a) for clear error. *Mondaca-Vega v. Lynch*, 808 F.3d 413, 426 (9th Cir. 2015).

district court to amend its findings or make additional findings" under Rule 52(b).

*Hollinger v. United States*, 651 F.2d 636, 640-41 (9th Cir. 1981).  Nationwide did not move the district court under Rule 52(b) to amend or make additional findings.[26]  Having failed to do so, its appeal under Rule 52(a) is barred.[27]  *See Hollinger*, 651 F.2d at 640-41.  Litigants like Nationwide should not be permitted to "simply ignore [Rule 52(b)] and head off to the appellate court to seek a remand for the making of those same findings."  *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 814 n.9 (Fed. Cir. 1990).

---

[26] Although Nationwide filed a motion under Rule 59(e) asking that the district court alter or amend its judgment, a motion under Rule 59(e) seeking to alter the ultimate outcome of a case does not ask the court to provide the relief Nationwide seeks here under Rule 52(a) – namely, more specific findings to clarify how the court arrived at that outcome.  *See Irving Tanning Co. v. Kaplan*, 876 F.3d 384, 390 (1st Cir. 2017) ("Rule 52(b) is intended to reduce the frequency of appellate remands by permitting the correction of errors in the district court; therefore, when a party fails to make a Rule 52(b) motion, that party should not be precluded altogether from appeal, but that party cannot challenge the specificity of the findings.") (*quoting* Wright & Miller, Federal Practice and Procedure § 2582, at 358-59 (3d ed. 2013)); *United States v. Tosca*, 18 F.3d 1352, 1355 (6th Cir. 1994) ("It is a general principle of appellate jurisprudence that a party desiring more particularized findings at the trial court level must request them from the trial court.").

[27] A party that neglects to file a Rule 52(a) motion cannot complain on appeal that the district court's findings "lack sufficient clarity," but it remains free to "raise the question of sufficiency of the evidence to support the finding."  *Hollinger*, 651 F.2d at 641.  This avenue of appeal does not apply here, as sufficiency of the evidence is not at issue in Nationwide's argument under Rule 52(a).  Nationwide argues that the district court did not provide a "reasoned explanation" for its findings, not that the evidence underlying those findings was somehow insufficient.  *See* Br. 57.

Yet even if an appeal under Rule 52(a) were available to Nationwide (which it is not), its arguments would nevertheless fail. It raises three issues in its brief, none of which has merit: (1) that the district court failed to specify whether it applied the correct standard of proof; (2) that the district court did not specify how Nationwide's conduct was abusive under the CFPA; and (3) that the district court failed to specify how the TSR applied to Nationwide's business.

First, Nationwide argues that because the Bureau sought civil penalties the district court should have applied a "clear and convincing" standard but failed to state whether it instead applied a preponderance standard.[28] But the Ninth Circuit has stated that "[t]he preponderance of the evidence standard applies in civil cases, including civil penalty cases." *United States v. F/V Repulse*, 688 F.2d 1283, 1284 (9th Cir. 1982) (citing *Addington v. Texas*, 441 U.S. 418, 423 (1978)). Exceptions to this rule "include only those cases involving fraud or possible loss of individual liberty, citizenship, or parental rights." *Id.* No such exception applies here, including fraud. As the most recent case addressing this question recognizes, "the overwhelming weight of precedent" has concluded that claims under the CFPA, including misrepresentation claims such as those at issue here, do not sound in fraud. *CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018). Moreover, "consumer protection claims are not

---

[28] On this point, Nationwide again erroneously claims that the CFPA is a "penal" statute. On this point see n.9, *supra*.

claims of fraud, even if there is a deceptive dimension to them," and construing

them otherwise would be "inconsistent with the remedial nature of consumer

protection statutes." *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp.

3d 1342, 1372-73 (N.D. Ga. 2015). Because no applicable exception applies, the

preponderance standard applies to the Bureau claims. *F/V Repulse*, 688 F.2d at

1284.

Second, Nationwide argues that the court failed to specify how Nationwide's

conduct constituted "abusive" conduct under the CFPA. Under 12 U.S.C.

§ 5531(d)(2) an act or practice is abusive if it takes unreasonable advantage of,

among other things, "a lack of understanding on the part of the consumer of the

material risks, costs, or conditions of the product or service." Citing these

standards, the court concluded that its findings were "sufficient to support liability

under both the 'abusive' and 'deceptive' prongs of the CFPA and under the TSR."

ER 20, 34 n.24. The court's factual findings are consistent with this conclusion.

For instance, with respect to defendants' claims regarding "average" interest

savings, the court found that "[a] reasonable consumer is likely to misunderstand

how defendants are using 'average.'" ER 29. Such misrepresentations took

advantage of consumers' lack of understanding of the conditions of the IM

Program by guaranteeing that consumers would immediately save money even

though it would take many years for consumers to achieve the savings Nationwide

promised. *See, e.g.,* ER 27-29. In any event, the district court's findings on abusiveness did not affect any remedies in this case, as the court stated that "[t]here is no suggestion that separate remedies for those violations would be appropriate." ER 34 n.24.

Finally, Nationwide argues that the district court did not state "how it reached the conclusion that the TSR applies to Nationwide's business," noting its argument in the district court "that it was not a 'seller' under the TSR." Br. 60.[29] But the court's findings established that defendants were engaged in "telemarketing" as "sellers," as those terms are defined under the rule. The TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). The court's findings place Nationwide's conduct squarely within that definition, as it found that Nationwide "fielded millions of incoming telephone calls at its call center" from consumers responding to Nationwide's direct-mail advertising, that those sales calls typically lasted as long as an hour, and that on those calls Nationwide's sales representatives sold the IM Program to consumers using sales scripts written by Mr. Lipsky. ER 19-20.

---

[29] To the extent Nationwide is suggesting that it does not meet the definition of "telemarketer" because it fits into some recognized exception, it has offered no facts or legal argument in support of such a claim. It therefore has waived any such argument on appeal. *See Graf*, 610 F.3d at 1166.

The court's findings also establish that defendants were sellers under the TSR, which defines "seller" as any person "who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). Again, the court's findings establish that Nationwide, including Mr. Lipsky in his individual capacity, fall well within that definition. Nationwide was the entity that provided the IM Program, and the telemarketing scripts and mailers "were all largely written by Lipsky himself." ER 20. Mr. Lipsky "was intimately involved in managing all aspects of the business on a day-to-day basis." *Id.* He therefore "arrange[d] for others to provide" the IM Program that Nationwide sold through its telemarketing operations. 16 C.F.R. § 310.2(dd); *see also* ER 20. The Ninth Circuit has reached the same conclusion under similar facts. In *FTC v. Stefanchik*, this Court held that an individual who, like Mr. Lipsky, was "owner, sole shareholder, director, and manager" and "retained authority to review and approve all marketing materials and made the decision as to what products were sold through the program" was a seller under the TSR, even if he personally "made no telemarketing calls." 559 F.3d 924, 930-31 (9th Cir. 2009). Nationwide offers no reason for deviating from this Court's analysis under the similar facts here.

56

**I.  The district court's findings of CFPA violations were supported by evidence at trial and therefore did not constitute clear error.**

Nationwide raises five factual issues for which it claims the district court committed clear error.  This Court reviews a district court's findings of facts following a bench trial for clear error and accepts the district court's findings unless it is "left with the definite and firm conviction that a mistake has been committed." *Kohler v. Presidio Int'l, Inc.*, 782 F.3d 1064, 1068 (9th Cir. 2015) (citations omitted).  Nationwide fails to meet this standard, which is "significantly deferential" to the district court, for any of the issues it raises.  *See id.*

First, the district court did not commit clear error in finding that Nationwide misrepresented its relationship with customers' lenders.  The court based this finding on misleading representations Nationwide made in its direct mailers – representations that could lead reasonable consumers to believe that they had "some kind of existing obligation" to respond to the mailers, or were "being contacted by some arm or department of the lender."  ER 26.  The court found that these representations rendered ineffective disclaimers Nationwide included that might otherwise have been sufficient to preclude consumer misunderstanding.  ER 26.  The court also cited evidence of actual consumer confusion on this issue, noting that "Nationwide's scripts include responses to be given to callers who ask whether Nationwide is, or is affiliated with, the lender."  ER 26-27.

Nationwide fails to identify any error in the district court's explanation of this finding, let alone explain how it constitutes clear error. Instead, Nationwide relies solely on the disclaimers in its letters and claims that because "the letters are the first interaction between a consumer and Nationwide, as a matter of law, these statements should be viewed as determinative that no misrepresentation could have occurred regarding Nationwide's affiliation." Br. 61. Nationwide offers no authority to support its argument that, "as a matter of law," such disclaimers necessarily prevented any misrepresentation. Moreover, the district court specifically addressed that argument by finding, as a factual matter, that although Nationwide's disclaimers "ordinarily [would] be sufficient" to preclude consumer misunderstanding about its affiliation with lenders, the misleading language Nationwide used in its mailings created a net impression that would leave reasonable consumers "confused – and therefore misled." ER 26. Nationwide does not address this factual finding by the district court, let alone establish how it constitutes clear error.

Second, the district court did not commit clear error in concluding that Nationwide made misleading claims about the timing and amount of interest savings. The district court based that finding on the misleading effect of Nationwide's claim about the "average" annual savings that consumers could expect under the IM Program. The court concluded that reasonable consumers

58

would understand "average" as referring to "minor variations or imprecisions in the numbers" – not an "average" that was based on savings over the entire life of the loan. ER 29. Thus, the district court concluded, "upon being told, for example, that there will be $1500 in interest savings the first year, a reasonable consumer can be misled into believing that his or her actual interest payments to the lender that year will be $1500 less than if he or she elects not to buy the IM program." ER 29. The court also found that the very nature of Nationwide's setup fees meant that "*all* representations regarding 'immediate' savings are misleading." ER 30 (emphasis added).

Nationwide challenges these findings by claiming that they were based on "a conclusion that 'reasonable consumers' do not understand how mortgages work." Br. 61. But the district court's findings on this issue were not based on what consumers did or did not understood about how *mortgages* work. They were based on the representations Nationwide made about how its *IM Program* worked. Moreover, Nationwide fails to address the court's additional finding that *all* representations Nationwide made regarding "immediate" savings were misleading given the nature of its setup fees. ER 30. None of these findings depends on consumer understanding of how mortgages work. Nationwide's claim of clear error on that basis therefore fails.

Third, the district court did not err in its finding that Nationwide made misrepresentations regarding whether lenders offered similar biweekly payment programs. As the court found, Nationwide's marketing materials "included multiple statements suggesting to potential customers that, with few exceptions, the only way to achieve savings through making bi-weekly payments was to enroll in the IM program, or perhaps through some other third party 'administrator.'" ER 31. The court noted that the trial record did not make clear how many lenders offered biweekly programs that were "functionally equivalent to the IM program," and acknowledged that the features of the IM Program might "serve as a basis for consumers to elect the IM program." ER 31-32. "That said," the court continued, "CFPB has adequately shown that defendants' representations to the effect a consumer must use the IM program . . . were materially misleading." ER 32.

Nationwide's claim of error on this finding mischaracterizes the court's reasoning. First, Nationwide cites the court's use of the word "exceptions" to argue that Nationwide did not claim "that the only way to achieve interest savings was to enroll in the Interest Minimizer program." Br. 62-63. Nationwide plucks this word out of context. What the court actually found was that Nationwide's marketing materials suggested that "*with few exceptions*, the only way to achieve savings" was to enroll in the IM Program. ER 31 (emphasis added). Thus the district court noted that, for example, Nationwide claimed that "[o]nly a small

60

percentage of lenders actually offer a bi-weekly mortgage program to their customers." ER 31. The court's acknowledgment of these "few exceptions" did not alter its ultimate finding that Nationwide's representations were materially misleading. *See* ER 32.

Nationwide also mistakenly claims that the district court based its finding on the presumption that other lenders' biweekly programs were "functionally equivalent" to Nationwide's IM Program. Br. 63. The court's findings were not based on any such finding of functional equivalence. Rather, the court used that term merely to acknowledge that any additional features the IM Program offered might "serve as a basis for consumers to elect the IM program." ER 31-32. Notwithstanding any such differences (functional or otherwise), the court concluded that Nationwide's representations were misleading. *See id*.

Fourth, Nationwide claims that the district court clearly erred because, at trial, its expert testified that people who own a home are "more likely to have purchased a home before and to have attended college or graduate school," and the district court "did not couch its analysis of hypothetical, 'reasonable consumers' with reference to this class" who received its mailings. Br. 63. Nationwide fails to explain the clear error on this issue. As a threshold matter, Nationwide offers no argument establishing why the district court was required to adopt the conclusions of Nationwide's own expert about the characteristics of homeowners generally.

Even if it had done so, Nationwide offers no argument why, by attending college and having previously bought a home, a "reasonable person" would have been inoculated against Nationwide's misrepresentations about the workings of its IM Program.

Finally, the district court did not commit clear error when it held that Nationwide misled consumers, and Nationwide's conclusory claim to the contrary simply rehashes factual arguments it made to the district court, while ignoring the controlling standard under *Gordon*. For instance, Nationwide points to its own expert's testimony about the statistical significance of the number of complaints Nationwide received but fails to offer any argument why the district court clearly erred in declining to adopt the expert's testimony as a factual finding.[30] Nationwide also does not explain why its assertions about consumer complaints would necessarily alter the district court's findings about Nationwide's representations. The relevant standard under *Gordon* is not whether a consumer bothers to submit a complaint about having been deceived (a standard that presumes the consumer is even aware of such deception), but whether a particular representation is likely to mislead consumers acting reasonably under the circumstances. *See Gordon*, 819 F.3d at 1193. Similarly, Nationwide points to

---

[30] Nationwide fails to address the district court's stated concern that the expert's testimony was not "scientifically derived," and that the "foundation" for his testimony was not something "I would be entirely comfortable with, to derive [his] conclusion." SER 17; *see also* SER 14-17 (discussing the Bureau's objections).

return rates and the results of its own consumer satisfaction surveys, but again fails to establish why the district court had to adopt these findings or why, under *Gordon*, such materials would establish any error in the court's findings.

**J. The district court did not err in concluding that Nationwide's telephone sales campaign constituted telemarketing under the TSR.**

The TSR defines telemarketing as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). The district court correctly determined that Nationwide was liable under the TSR in light of its telemarketing activities. Because it concerns the interpretation of a regulation, any legal determinations on this issue are reviewed de novo. *United States v. Lee*, 183 F.3d 1029, 1033 (9th Cir. 1999). However, as a mixed question of fact and law any "underlying factual findings are reviewed for clear error." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

Nationwide acknowledges in its brief facts sufficient to establish that it engaged in telemarketing as defined under the TSR. As Nationwide states, the company "requires an [sic] substantial, interactive telephone conversation with homeowners lasting approximately 60 to 90 minutes in order to enroll in the Interest Minimizer program." Br. 7. Nationwide also states that it provides its IM Program to consumers in over forty states. Br. 6. Therefore, by its own admission, Nationwide engaged in telemarketing under the TSR: it conducted a program "to

induce the purchase of goods or services" by using "one or more telephones" and by making "more than one interstate telephone call." 16 C.F.R. § 310.2(gg).[31]

Ignoring these undisputed facts, Nationwide makes the remarkable claim in its brief that the company "does not engage in telemarketing."[32] Nationwide instead offers two arguments about the meaning of telemarketing, neither of which is supported by the TSR or any legal authority.

First, Nationwide argues that telemarketing under the TSR applies only to businesses that sell products or services "solely" by use of telephone and not, as in Nationwide's case, by direct mail asking that consumers call the company. Br. at 66. Nationwide offers no regulatory text or legal authority in support of this reading of the TSR. Nor could it. Far from conceiving of telemarketing as limited "solely" to use of the telephone, the rule specifically contemplates that persons subject to the TSR will also engage in other forms of communication with potential customers, including by use of direct mail. For example, § 310.6 exempts from the TSR certain acts and practices, including "telephone calls initiated by a customer

---

[31] The district court's finding are consistent with these facts. It concluded that Nationwide "fielded millions of incoming telephone calls," during which its sales representatives used prepared scripts to sell its IM Program. ER 19-20.

[32] The point heading introducing this section of Nationwide's brief states that it will address how Nationwide is not a "seller" under the TSR. *See* Br. at 65. But Nationwide makes no mention of "seller" anywhere in this section of its brief and instead addresses only the meaning of the term "telemarketing." *See* Br. at 65-67. To the extent Nationwide is making any argument regarding the term "seller," it has waived that argument for failure to brief the issue. *See Graf*, 610 F.3d at 1166.

or donor in response to a direct mail solicitation" – but only if the solicitation "clearly, conspicuously, and truthfully" discloses information required under the TSR regarding the costs, terms, and conditions of the goods or services. Section 310.6 therefore establishes that a person who – like Nationwide – fails to make such disclosures in its direct mailings will *not* be exempt from the rule. Nationwide thus is mistaken in arguing that the TSR does not apply to entities that use direct mail in conjunction with their telephone marketing campaigns.[33]

Second, Nationwide argues that it was not engaged in telemarketing because consumers completed the enrollment process by executing their enrollment agreement through an online portal. Nationwide again offers no textual or legal authority to support this argument. And, again, the TSR contradicts Nationwide's argument. To qualify as telemarketing, the TSR only requires that the telephone campaign be "conducted to *induce* the purchase of goods or services" – not that the contract for goods and services be executed over the telephone. 16 C.F.R. § 310.2(gg) (emphasis added). Nothing in the rule suggests that telemarketers can escape TSR liability by directing a consumer on a telemarketing call to execute a document online. Nationwide offers no authority to the contrary.

---

[33] Nationwide never claimed that it met the requirements of § 310.6. Even if it had done so, the misrepresentations found by the district court would have disqualified Nationwide from the exemption.

**K. The district court did not misapply the stigma-plus test, as it did not find any actionable stigma caused by the Bureau.**

Turning to its counterclaims against the Bureau, NBA argues that the district court "erred as a matter of law in its legal conclusion about the requirements for the 'stigma-plus' test" that applies to NBA's due process claim. Br. at 68. NBA claims that, in evaluating its counterclaim that the Bureau engaged in improper "extra-judicial" conduct to pressure banks into severing their relationships with the company, the district court inappropriately focused on whether the "stigma created by the [Bureau's] press release" was the exclusive cause of NBA's lost banking relationships. The very premise of NBA's argument is in error, as the district court made no finding that the Bureau's issuance of a press release – or any conduct by the Bureau – caused the company stigma necessary to support a stigma-plus claim.[34]

The "stigma-plus" test is a two-step test requiring that, when a plaintiff alleges a due process violation stemming from the stigma of government defamation, the plaintiff establish not only the defamation itself but also the "plus" of "some more tangible interest . . . or the alteration of a right or status recognized

---

[34] Other than the press release itself, the exhibits NBA cites in support of its argument were not admitted into evidence. *See* Br. at 68-69 (citing Exhibits 943-47, 949, 966, 967, and 974-76 in ER 1271-1388). *See also* SER 9 (noting that Exhibits 943-47, 949, 966, 967, and 974-76 were identified but not received into evidence). To the extent NBA is claiming error in the district court's factual findings, such evidence was not properly before the court and therefore cannot support NBA's claim on appeal.

by state law." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (quotations omitted) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Therefore the "plus" of additional harm comes into play only if the plaintiff has established the factual predicate that the government "created 'a false and defamatory impression.'" *Id.* at 983 (citing *Codd v. Velger*, 429 U.S. 624, 628 (1977)).[35]

NBA did not prove this first part of the stigma-plus test. The district court held that "defendants lack any facts to support the claim of wrongful extra-judicial pressure." ER 39. Having found that NBA failed to show *any* such improper conduct by the Bureau – including by making a "false and defamatory impression" through its press release or otherwise – it would have been a legal and logical non sequitur for the court to then opine on the "plus" factor under the stigma-plus test and speculate as to how the Bureau's conduct caused the harm NBA alleged. In other words, the district court could not (as NBA claims) err in its analysis of the causal relationship between causation and harm under the stigma-plus test, for the simple reason that it found no stigma. NBA's claim of error therefore necessarily fails.

---

[35] NBA concedes this aspect of the stigma-plus test, citing a 2001 unreported opinion of this Court that includes "injury to reputation" as a necessary element of a stigma-plus allegation. *See* Br. 72-73 (discussing *Crowe v. Cty. of San Diego*, 13 F. App'x 560 (9th Cir. 2001)).

**L. The district court did not abuse its discretion in excluding from evidence hearsay and other materials that NBA had failed to link to any witness or other evidence.**

In hearing evidence regarding NBA's counterclaims, the district court properly excluded a series of reports and other exhibits on the grounds that they constituted hearsay and had not been linked to any witness or other evidence in the case. This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010). NBA can establish no such abuse of discretion in excluding the exhibits at trial.

After questioning its first and only witness at trial in support of its counterclaims, NBA sought to introduce into evidence a series of out-of-court statements consisting of reports, memoranda, and newspaper articles, many of which the company claimed were related to what it alleged was "Operation Choke Point." *See* SER 30-43; Br. at 75.[36] NBA's stated basis for admitting these exhibits was their "effect on the reader" and the reader's "state of mind." SER 31, 38, 41, 39 (confirming that "all of [the exhibits]" were offered for their effect on the reader). NBA identified these purported "readers" as "banking officials" and

---

[36] *See* SER 30 (statement by NBA's counsel that "I do not have any further witnesses, but I do have a number of documents that I would like to move into admission in evidence."). The exhibits NBA attempted to introduce were Exhibits 943, 944, 945, 946, 947, 949, 974, 975, and 976. *See* SER 9. At trial NBA called none of the authors of these materials, nor any person mentioned in them.

the "banking industry," but called no banking officials (or other persons) to testify that they had ever read or even received these materials, let alone that the documents had any effect on them or their state of mind. SER 39, 31. The Bureau objected to all of these exhibits on hearsay and relevance grounds, and the court sustained all objections. *See* Br. at 76.

NBA now claims that the district court abused its discretion in excluding these exhibits. As to hearsay, NBA claims that these exhibits – all of which constituted out-of-court statements – are admissible because they were not offered for truth of the matter asserted in them, but instead to show their effect on unidentified "members of the banking industry." Br. 76.

Although NBA notes that out-of-court declarations otherwise constituting hearsay may be offered to show their effect on the listener,[37] it points to no authority that this "listener" (or "reader") can be generalized to a group of persons as vast as the nation's banking industry – particularly where, as here, none of those persons has been identified, testified at trial, or was shown to have ever read or received the proffered evidence. Cases in which this Court has applied the "effect on the listener" principle illustrate this point. In contrast to the hypothesized "readers" of NBA's eleven different exhibits, such cases concern the responses of individually identifiable persons to discrete pieces of evidence.

---

[37] *See* Br. at 76 (citing *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935 (9th Cir.), *amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002)).

For instance, in the *Los Angeles News Service* case NBA cites in its brief, the "listener" in question was the employee of a defendant accused of copyright infringement, and the evidence at issue (which otherwise would have been hearsay) was the recounting of a specific telephone call showing why the employee mailed the plaintiff the copyrighted material at issue in the case. 305 F.3d 924, 934 (9th Cir. 2002). And in *United States v. Payne*, the "listener" was an alleged victim of child abuse, and the evidence at issue (an out-of-court statement she heard her mother make) helped explain why the child initially denied the abuse ever happened. 944 F.2d 1458, 1472 (9th Cir. 1991).

In contrast to the rule NBA seeks this Court to endorse, these cases do not stand for the proposition that the "effect on the listener" exception can apply generally to an entire series of exhibits en masse, as NBA sought with its eleven separate exhibits here. Nor do they suggest that the "listener" can be an unidentified class of persons – or even an entire sector of the economy as massive as the "banking industry." Such an application would swallow this exception to the hearsay rule. It would also prejudice the Bureau, as NBA called no banking officials whom the Bureau could cross-examine to determine if they ever read the materials in question, let alone whether the materials had any "effect" on them or their "state of mind."

On the question of relevance, NBA again relies on the causation argument it proposed with its stigma-plus argument, claiming that the court excluded the exhibits because it applied a "caused by" standard as opposed to a "connection with" standard. *See* Br. 77. But the court's relevance determination was not based on any causation determination, but rather on the absence of evidence tying the exhibits to the claims in this case. As the court noted, NBA produced no witness, let alone any witness from a banking institution, stating that he or she "received this material" or made any decision based on that material. SER 36. In other words, the court concluded, NBA simply lacked the evidence to "link it up" with the case. *Id.* Even if NBA had been able to establish such a link, it lacked any basis to overcome the hearsay objections noted above. The district court therefore did not abuse its discretion in excluding the various reports and other exhibits NBA offered.

**M. The district court did not abuse its discretion in concluding that NBA failed to establish the foundation necessary to qualify Brian Kelley as an expert.**

The district court did not abuse its discretion in excluding Brian Kelley as an expert in support of NBA's counterclaims. NBA's argument to the contrary ignores the district court's reasons for disqualifying him. A district court's rulings on the admissibility of expert testimony are reviewed for an abuse of discretion and will be reversed only if "manifestly erroneous." *United States v. Hankey*, 203 F.3d

1160, 1167 (9th Cir. 2000) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 (1997)).

In determining whether to admit expert testimony, trial courts must assure themselves that such testimony "both rests on a reliable foundation and is relevant to the task at hand." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).[38] The district court correctly found that NBA failed to satisfy either of these prongs. As the court stated, NBA failed to make "an adequate foundation for [Mr. Kelley's] testimony," and failed to show that his "proffered opinions are appropriate subjects for expert testimony." ER 52.

The district court's conclusions reflect the deficiencies in Mr. Kelley's knowledge and expertise as an expert who could credibly testify about the Bureau's alleged interference with NBA's banking relationships. For instance, Mr. Kelley lacked basic knowledge about NBA's business and could not tie the

---

[38] As this Court has acknowledged, under *Daubert*, relevancy is construed in terms of "fit." *See In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138 (9th Cir. 2002) (noting the relationship between "relevancy, or fit"); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) (the "fit" requirement "goes primarily to relevance") (*citing Daubert*, 509 U.S. at 591). The relevance standard for expert evidence is not a mere "reiteration of the general relevancy requirement of Rule 402"; the evidence therefore must speak "clearly and directly to an issue in dispute in the case." *Id.* Also encompassed in relevance "is whether it is helpful to the jury, which is the 'central concern' of Rule 702." *Elsayed Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) (citation omitted).

alleged targets of Operation Choke Point to any of the company's business activities. *See* ER 1487. He also failed to verify the credibility of the sources on which he based his opinions and did not adopt any expert methodology for evaluating such information. *See* ER 1488, 1493. He acknowledged that, instead of bringing any "facts or data" or reliable method to his analysis regarding NBA's claims, he instead relied on his gut beliefs: "just in my experience, things don't happen by coincidence; there is an underlying decision that results in a broad termination of accounts like that." ER 1493. Such conclusions "based on . . . personal opinions and speculation rather than on a systemic assessment" of the facts must not be admitted. *Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339, 342 (S.D. Cal. 2010). In light of these considerations, NBA cannot show that the district court abused its discretion in determining that Mr. Kelley's opinions lacked "adequate foundation" and were not "appropriate subject for expert testimony." ER 52.

NBA addresses none of the deficiencies in Mr. Kelley's qualifications and identifies no error in the district court's analysis. Instead, it recites legal standards regarding the admission of expert testimony and offers a bullet list of Mr. Kelley's various opinions that NBA sought to admit. *See* Br. 78-80. NBA then claims that these opinions "related to Nationwide's counterclaims under the stigma-plus standard," that the exclusion of the opinions "impaired" its ability to prove its

counterclaims, and that the district court was "likely" influenced by its analysis of the stigma-plus standard. Br. 80. These conclusory assertions address neither of the district court's stated grounds for excluding Mr. Kelley's testimony and identify no error in the district court's analysis. NBA therefore offers no basis for finding any error in the district court's ruling.

**N. Nationwide's challenge to the Bureau's constitutionality is waived and, regardless, lacks merit.**

In its brief Nationwide challenges the constitutionality of the Bureau's structure. This Court reviews constitutional and other questions of law de novo. *Bojnoordi v. Holder*, 757 F.3d 1075, 1077 (9th Cir. 2014).

As preliminary matter, Nationwide has waived its constitutional argument by failing to adequately brief the issue. *See Graf*, 610 F.3d at 1166. The bulk of Nationwide's meager four-paragraph discussion simply cites prior cases that have addressed the issue, but it offers no argument or analysis. *See* Br. 81. The Court should therefore deem the argument waived.

Even if Nationwide had adequately briefed this issue (which it has not), any argument challenging the constitutionality of the Bureau's structure would be without merit. Nationwide appears to argue that the Bureau is unconstitutionally structured (and that the action against Nationwide is therefore invalid) for two reasons: (1) a provision granting for-cause removal protection to the Bureau's Director "is an unconstitutional usurpation of Executive power," and (2) "the

74

Bureau's ability to fund itself without Congressional oversight" violates "Art. I,

§ 7, cl. 1; § 8, cl. 1; § 9, cl. 7." Br. 81. Both arguments lack merit.[39]

As the en banc D.C. Circuit held, the for-cause removal protection for the

Bureau's Director is constitutional. *See PHH Corp. v. CFPB*, 881 F.3d 75 (D.C.

Cir. 2018). Under controlling Supreme Court precedent, whether a removal

restriction is constitutional turns on whether it impedes the President's Article II

power to ensure that the laws are faithfully executed. *See Morrison v. Olson*, 487

U.S. 654, 691 (1988); *see also Free Enter. Fund v. Public Co. Accounting

Oversight Bd.*, 561 U.S. 477, 496 (2010). The restriction on removal of the

Bureau's Director does not impede that power. Indeed, the Supreme Court has

upheld an identical removal restriction for members of the FTC. *See Humphrey's

Executor v. United States*, 295 U.S. 602, 619-20, 623 (1935); *compare* 15 U.S.C.

§ 41 (1934) ("Any Commissioner may be removed by the President for

inefficiency, neglect of duty, or malfeasance in office."), *with* 12 U.S.C.

§ 5491(c)(3) ("The President may remove the Director for inefficiency, neglect of

duty, or malfeasance in office."). There is no basis to distinguish this precedent.

---

[39] As noted in the Bureau's statement of related cases, several appeals pending before this Court address the constitutionality of the Bureau's structure. *See, e.g.*, *CFPB v. Seila Law, LLC*, No. 17-56324 (oral arg. held Jan. 8, 2019). The Bureau respectfully requests that, should it decide to rule in this case on an issue of such magnitude, the Court seek additional briefing from the parties so that the range and complexity of issues regarding the Bureau's constitutionality may be properly presented for consideration.

The Bureau's functions are "remarkably similar" to those of the FTC. *PHH*, 881 F.3d at 94. And although the FTC is led by a multimember commission, while the Bureau is led by a single Director, that fact does not make any constitutional difference. *Id.* at 96-101. If anything, the Bureau's single-Director leadership *increases* the President's ability to oversee the agency by establishing a single point of accountability for the agency's conduct. *Id.* at 98.

Nationwide's one-sentence challenge to the Bureau's purported ability to "fund itself without Congressional oversight" (Br. at 81) likewise lacks merit. To begin, it is factually incorrect. Congress, by statute, authorized the Bureau to obtain the funds that it reasonably needs to carry out its mission from the Federal Reserve, up to specified annual limits. 12 U.S.C. § 5497(a). It is therefore *Congress* that has funded the Bureau. And Congress exercises oversight over that funding. By statute, the Bureau must submit annual reports to the House and Senate Appropriations Committees regarding the Bureau's finances, 12 U.S.C. § 5497(e)(4), and Congress of course retains full power to change the Bureau's funding pursuant to the ordinary legislative process.

Nationwide offers no argument why the Bureau's funding is unconstitutional and instead just states that the Bureau's funding violates three provisions of Article I, without explaining what those provisions say, let alone their relevance to its claim. *See* Br. at 81 (citing constitutional provisions that, among other things,

76

require that "[a]ll bills for raising revenue shall originate in the House of Representatives," grant Congress authority to "lay and collect taxes" and "provide for the common defense and general welfare," and provide that "[n]o money shall be drawn from the Treasury, but in consequence of Appropriations made by Law"). In the absence of any such discussion, it is difficult for the Bureau to respond to Nationwide's assertion. But if Nationwide means to argue that Congress exceeded its powers by funding the Bureau outside of the annual appropriations process, that argument is meritless. The Constitution permits Congress to "create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process." *PHH*, 881 F.3d at 95; *accord Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004). Indeed, that is entirely commonplace for financial regulators. *PHH*, 881 F.3d at 95.

For all these reasons, this Court should deem Nationwide's constitutional argument waived or, in the alternative, it should reject Nationwide's argument given its lack of merit.

### O. The district court's injunction was not issued in error and is not overbroad.

The district court's injunction against Nationwide complies with the law of this circuit, and Nationwide's contrary argument ignores both the applicable legal standards and the district court's underlying factual findings. In reviewing

77

permanent injunctions issued by a district court, this Court reviews "the legal conclusions de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013). "A strong showing of abuse must be made to reverse" a district court's decision to grant an injunction. *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854 (9th Cir. 1995) (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

The CFPA authorizes courts to grant "any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law," including violations of rules under those laws. 12 U.S.C. § 5565(a). The Act further specifies that such authority includes the power to order "limits on the activities or functions" of persons who engage in such violations. 12 U.S.C. § 5565(a)(2)(G). This grant of authority is consistent with the general power of federal courts to "restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 132 (1969) (quoting *NLRB v. Express Publ'g Co.,* 312 U.S. 426, 435 (1941)). As this Court has stated, "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically

provides for injunctive relief." *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010) (citation omitted). In light of these standards, none of Nationwide's arguments challenging the district court's injunction has merit.

First, Nationwide claims that "there is no cognizable danger of a recurrent violation" and cites the Supreme Court's decision in *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). Br. 82. Although Nationwide does not discuss it, this Court has established a multi-factor test for evaluating whether a permanent injunction is consistent with *W. T. Grant*. In *SEC v. Murphy*, this Court identified factors such as the degree of scienter, the recurrent nature of the conduct, and the sincerity of defendant's assurances:

> In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violations, and it considers factors such as the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations.

626 F.2d 633, 655 (9th Cir. 1980) (discussing *W. T. Grant*, 345 U.S. at 635) (citations omitted).

Nationwide addresses none of these factors. Instead, it offers self-serving and unsupported claims about purported changes it made to its business practices before the Bureau filed suit, points to licenses it was issued by state

authorities, and (in contradiction to the district court's findings of multiple CFPA and TSR violations) makes a generic claim that it "made significant efforts to adhere to legal requirements." Br. 83. These arguments fail to show any error by the district court under the factors this Court established in *Murphy*.

Applying those factors demonstrates that the district court's injunction was appropriate. *See Murphy*, 626 F.2d at 655. With respect to the first factor regarding the degree of scienter, the district court's finding that Nationwide was "willing to push up against the legal limits" in marketing its IM Program – and the "aggressiveness with which defendants pushed the line" – supports the conclusion that injunctive relief is warranted to ensure that Nationwide does not continue to violate the law. ER 38. With respect to the "isolated or recurrent nature of the infraction," the district court's finding that Nationwide's illegal conduct continued as far back as July 2011 demonstrates that Nationwide's violations were recurrent and ongoing. Finally, the fact that Mr. Lipsky "intends to reopen Nationwide," ER 564, supports the issuance of injunctive relief to ensure that Nationwide does not again violate the CFPA or TSR, particularly where it has provided no credible or specific "assurances against future violations." *Murphy*, 626 F.2d at 655.

Second, Nationwide claims that provisions related to disclosure of its fees are overbroad because the district court did not find that the Bureau proved its CFPA and TSR claims regarding Nationwide's fee disclosures. *See* Br. 84.

80

Nationwide's argument misses the point. The district court found that Nationwide's misrepresentations regarding the timing and amount of interest savings were the result of Nationwide's failure to account for the effect of its setup fee and the manner in which those fees were described to consumers. *See, e.g.*, ER 29 (noting that the total "savings" Nationwide claimed "will be even less in light of the fees."). By addressing the disclosure of Nationwide's fees in its injunction – including in any "savings analysis" Nationwide might provide – the district court's injunction helps ensure that Nationwide will not continue to misrepresent the savings consumers might realize. ER 11-12. The injunction therefore is not overbroad.

Finally, Nationwide claims that the district court's injunction "excessively burdens" its First Amendment rights. Br. 84. In support of this argument Nationwide selectively quotes the district court's injunction to suggest, incorrectly, that the injunction prohibits entire categories of speech, such as "making any statement, directly or by implication" regarding its relationships with banks and "discussing alternatives to the Interest Minimizer program." Br. 85. The injunction does no such thing. What it prohibits are "*false or misleading statements*" about these topics, as well as other topics – such as representations about the amount and timing of interest savings – that the district court already had concluded were false or misleading. *See, e.g.,* ER 9-11. Far from imposing

"excessive burdens on commercial speakers," such restrictions on false or misleading statements by commercial speakers are entirely consistent with First Amendment principles, as the *Zauderer* case cited by Nationwide confirms. *See* Br. 86; *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading."). Nationwide therefore cannot show that the injunction is overbroad.

## P. Nationwide's claim of cumulative error does not entitle it to a new trial.

Nationwide argues that it deserves a new trial because of prejudice caused by cumulative errors, but its argument fails for the fundamental reason that it has failed to establish any error by the district court – let alone any material error. But even if it had shown such error, Nationwide's request for a new trial would still fail for multiple reasons. First, Nationwide did not request a new trial in the district court. Therefore, Nationwide can point to no decision for this Court to review and has waived the issue. *See Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) ("an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it.") (quotation omitted); *Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

But even if it had sought a new trial in the district court, Nationwide has failed to adequately brief this issue, as it has identified neither the prejudice it

suffered nor the cumulative errors giving rise to such prejudice. In the lone sentence purporting to explain its argument, Nationwide states only that there was a "cumulative prejudicial effect" based on "numerous errors." Br. 86. Nationwide does not identify what constitutes this "cumulative prejudicial effect," nor what errors led to this purported prejudice. As demonstrated by the two Ninth Circuit cases on Nationwide relies, claims of cumulative error must – unlike Nationwide's claim – establish a connection between the underlying errors and the prejudice at issue.

For instance, *Gordon Mailloux Enterprises, Inc. v. Firemen's Insurance Co.* was an insurance coverage case in which the admission of evidence regarding the timing of the underlying insurance policies could have led the jury to conclude that the policies were void. 366 F.2d 740, 742 (9th Cir. 1966). And *Gonzales v. San Jose Police Department* was a discrimination case in which the district court failed to properly consider two pieces of evidence directly related to the proof of plaintiff's claim.[40] 901 F.2d 758, 761-62 (9th Cir. 1990). In both cases the Court identified the particular errors and explained how they might have prejudiced the outcome of the case. Nationwide, in contrast, specifies no particular error. Nor does it explain how, in combination with any other error, it suffered any prejudice.

---

[40] *Gonzales* did not involve a request for a new trial. *See* 901 F.2d at 760. The case therefore does not support Nationwide's argument for a new trial.

Instead, Nationwide's argument appears to be that the sheer number of issues raised in its brief constitutes "cumulative error," and that any unfavorable outcome constitutes "prejudice." This Court has declined to endorse such "kitchen sink" strategies, and it should decline to adopt such a standard here. *See Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997) (a "hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court.").

Finally, Nationwide fails to state why the cumulative errors it has claimed require a new trial. This matter was tried as a bench trial, so no jury could have been influenced by the unspecified "effect" of the unspecified errors Nationwide has claimed. Nationwide also fails to explain why a new bench trial would be necessary, as it would re-litigate factual issues not at issue in such errors. Granting its request for a new trial would therefore constitute a waste of judicial resources.

## II. The Bureau's Cross-Appeal

### A. Standard of Review

A district court's decision to grant or deny restitution "is reviewed for abuse of discretion or the application of erroneous legal principles." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). Where a party "claim[s] that the district court relied on an erroneous legal premise in reaching its decision, [the

court of appeals] review[s] the underlying legal issue de novo." *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003).

**B. The district court applied erroneous legal principles in declining to award restitution.**

The district court found that Nationwide violated the CFPA by making misleading representations to consumers who purchased its IM Program, including by misleading consumers about the amount and timing of the interest savings they would achieve. As the district court found, Nationwide's misrepresentations likely misled consumers into believing that, by enrolling in the IM Program, they would pay $1500 less in interest in the first year alone, when in fact their savings would be only "minimal." ER 29. Despite concluding that these (and other) misrepresentations violated the CFPA, and despite acknowledging the undisputed evidence that consumers paid Nationwide more than $73 million in setup fees for interest savings that would not materialize as promised, the court nevertheless declined to award *any* restitution to compensate consumers for the harm that Nationwide's misrepresentations caused them. This was error.

It is somewhat unclear whether the district court concluded, based on its "balancing [of] the equities" (ER 36-37), that restitution was not appropriate at all, or whether it merely concluded that the *amount* that the Bureau sought was inappropriate, *see* ER 37 (concluding that the Bureau had not offered a basis for "limited" restitution that would make for a "just result"). Either way, its decision

rested on erroneous legal principles and must be reversed. Because the Bureau sought legal restitution, the district court did not have discretion to deny that relief outright based on equitable factors. To the extent the court's decision was based on its conclusion that the Bureau had not established an appropriate amount of restitution, that decision was also in error, as it failed to follow this Court's burden-shifting framework for calculating restitution.

1. **The district court lacked discretion to deny legal restitution based on a balancing of the equities and, regardless, abused any discretion it had to exercise.**

In its decision to deny restitution, the district court stated that, "balancing the equities," the Bureau failed to show that the restitution it sought was appropriate. ER 36-37. To the extent the district court concluded that it could deny restitution altogether on the basis of equitable reasons, that decision was in error. Where the Bureau establishes a violation and resulting harm, it is entitled to recover legal restitution to compensate consumers for that harm – and a district court lacks discretion to deny that relief based on its view of the equities.

As this Court has stated, restitution may be legal or equitable. *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 601 (9th Cir. 2016); Restatement (Third) of Restitution § 4 (2011); *see also* 12 U.S.C. § 5565(a)(1) (authorizing "legal or equitable" relief). Although courts generally have some discretion when awarding equitable relief, Dan B. Dobbs, *Law of Remedies* at 12, § 1.2 (2d ed. 1993)

(hereinafter, "Dobbs"), that principle does not apply where, as here, a party seeks *legal* restitution. As this Court has explained, "'[e]quitable' restitution requires tracing the money or property the plaintiff seeks to recover to identifiable assets in the defendant's possession . . . , whereas 'legal' restitution seeks imposition of 'a merely personal liability upon the defendant to pay a sum of money.'" *Commerce Planet*, 815 F.3d at 601 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)). Here, the Bureau did not seek identifiable assets in Nationwide's possession, but rather a judgment ordering Nationwide to pay a sum of money – *i.e.*, legal restitution.

In general, courts do not have discretion to deny "legal" relief. *See Curtis v. Loether*, 415 U.S. 189, 197 (1974). Rather, a "legal remedy" is awarded "as a matter of course when the right [is] established." Dobbs at 12, § 1.2 (contrasting legal remedies with equitable remedies, which could be refused "even if plaintiff proved a good case and defendant proved no defense that would defeat plaintiff's legal rights"). Thus, for example, the Supreme Court has held that while "an equitable remedy" is "committed to the discretion of the trial judge," "there is no comparable discretion" for an award of damages because that is not "equitable relief." *Curtis*, 415 U.S. at 197; *see also United States v. Hayward*, 36 F.3d 832, 839 (9th Cir. 1994) (explaining that Supreme Court had "found no discretion with respect to actual damages" under statute because the claim was "a legal claim for

87

damages, not an equitable claim for restitution" (citing *Curtis*, 415 U.S. 189)).
Rather, where a plaintiff proves both a violation and resulting harm, it "is entitled
to judgment for that amount." *Curtis*, 415 U.S. at 197 (holding that "if a plaintiff
proves unlawful discrimination and actual damages, he is entitled to judgment for
that amount").

Nothing in the CFPA authorized the district court to deviate from these
principles governing the award of legal restitution. The CFPA does not displace
the principle that legal relief – such as the legal restitution that the Bureau sought
here – is non-discretionary. To be sure, the statute provides that a court "shall have
jurisdiction to grant" relief for violations of federal consumer financial law, not
that it "shall grant" such relief. But this permissive language is not enough to
override the principle that legal relief is mandatory once the violation and resulting
harm have been established. *See Curtis*, 415 U.S. at 189-90, 197 (legal relief of
damages was non-discretionary even though statute used permissive language in
providing that courts "may" grant such relief) (quoting 42 U.S.C. § 3612). The
district court therefore erred to the extent it denied restitution based on its view of
the equities.

Moreover, even if the district court *did* have discretion to deny restitution
based on equitable factors, it is well established that a court may not deny relief for
reasons "contrary to the purposes" of the underlying statute. *Pantron I*, 33 F.3d at

88

1103 (holding that it is legal error to deny restitution under FTC Act for reasons that are "contrary to the purposes of the Act"); *see also, e.g.*, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975) (holding that although decision to award backpay under Title VII was left to court's equitable discretion, "[a] court must exercise this power in light of the large objectives of the Act"); *id.* at 421 (holding that "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes"); *Mitchell v. Robert DeMario Jewelry*, 361 U.S. 288, 296 (1960) (holding that "the statutory purposes" of the Fair Labor Standards Act leave "little room for the exercise of discretion not to order reimbursement" for lost wages); *Marshall v. Chala Enters., Inc.*, 645 F.2d 799, 802 (9th Cir. 1981) (rejecting district court's reasons for denying restitutionary relief because they were "at odds with the policy of the Fair Labor Standards Act").

Here, the district court may have concluded that restitution was not appropriate in any amount because Nationwide's misrepresentations about the amount and timing of interest savings, though misleading, had some basis in "literal truth." ER 36. That reasoning conflicted with the statutory purpose of the CFPA and was therefore legally erroneous. The CFPA explicitly aims to protect consumers from "unfair, deceptive, [and] abusive" financial services practices. *See* 12 U.S.C. §§ 5536(a)(1)(B), 5511(b)(2). Misrepresentations violate this prohibition, and consumers suffer the same harm, regardless of whether the

statements are "literally true." *See, e.g., Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1062 (9th Cir. 2011) ("[W]e emphasize that a literally true statement can still be misleading."). Indeed, the most potent misrepresentations often have an articulable basis in fact that makes them seem more trustworthy. That is why prohibitions on deceptive conduct forbid false *and* misleading claims, not just false ones. *See, e.g., Gordon*, 819 F.3d at 1192 (noting that deceptive acts and practices under the CFPA include those "likely to mislead" in reviewing a finding that defendant "falsely represented" claims to consumers in violation of the Act). Thus, to the extent that the court denied restitution altogether on the ground that Nationwide's deceptive statements were literally true, that denial was legally erroneous because it undermines the very purpose of prohibiting deceptive conduct.

Moreover, denying restitution for such conduct is legally erroneous because it undermines effective enforcement of the law. As this Court held in *Wirtz v. Malthor, Inc.*, it is improper to deny restitution on the ground that defendants "acted in a good faith belief" that their conduct was lawful because that would fail to "depriv[e] a violator of … gains accruing to him through his violation," which would diminish "the effectiveness of the enforcement of the Act." 391 F.2d 1, 2-3 (9th Cir. 1968) (discussing award under Fair Labor Standards Act). Similarly, the Supreme Court has held that denying restitutionary relief under Title VII would

90

leave employers with "little incentive to shun practices of dubious legality." *Albemarle Paper*, 422 U.S. at 417. A "reasonably certain prospect" of having to pay back wages is what "provides the spur or catalyst which causes employers" to come into compliance with the statute. *Id.* at 417-18.

This reasoning applies with full force here. Just as it was improper in *Wirtz* to deny restitution based on the defendants' good faith, it would be improper to deny restitution on the premise that Nationwide based its misrepresentations on some "literal truth." And as in *Wirtz* and *Albemarle Paper*, denying restitution in this case would allow Nationwide to retain all of the "gains accruing to [them] through [their] violation," *Wirtz*, 391 F.2d at 3 – namely, the amounts that consumers paid Nationwide that they would not have paid had they known the truth, including that they would not achieve anywhere near the $1500 in savings Nationwide promised in the first year. Allowing Nationwide to retain all of these gains would diminish "the effectiveness of the enforcement of the Act," *id.*, and leave market actors with "little incentive to shun" literally true but deceptive statements or other "practices of dubious legality," *Albemarle Paper*, 422 U.S. at 417-18.

## 2. The district court misapplied this Court's precedent in concluding that the Bureau had not established an appropriate amount of restitution.

Another basis for the district court's denial of restitution appears to have been its conclusion that the *amount* requested by the Bureau was not appropriate.

That too was in error, as the Bureau met its burden to establish the appropriate restitution amount under the "two-step burden-shifting framework" this Court adopted for calculating restitution awards under the CFPA. *See Gordon*, 819 F.3d at 1195 (9th Cir. 2016). Under that framework, "the government 'bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains.'" *Id.* (quoting *Commerce Planet*, 815 F.3d at 603). At this step, "a defendant's net revenues" can be used "as a basis for measuring unjust gains." *Id.* Once "the government makes this threshold showing, the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains." *Id.* At this second step, "[a]ny risk of uncertainty . . . falls on the wrongdoer whose illegal conduct created the uncertainty." *Commerce Planet*, 815 F.3d at 604.

The Bureau met its burden under the first step of this burden-shifting framework by establishing the amount of Nationwide's net revenues – which, the district court found (and Nationwide did not dispute), totaled $73,955,169. ER 34-35. Under *Gordon*, that figure provided a "basis for measuring unjust gains" and, therefore, the burden shifted to Nationwide "to demonstrate that the net revenues figure overstates the defendant's unjust gains." *Gordon*, 819 F.3d at 1195.

Nationwide made no effort to meet that burden. As the district court stated, Nationwide "presented no evidence or argument calling into question the accuracy

of these dollar figures." ER 35. Nor did it offer any evidence showing that those amounts "overstate[d] [their] unjust gains," *Gordon*, 819 F.3d at 1195. Even if Nationwide had complained that the net revenue amount was too high because consumers received some value from their service, it offered no basis for calculating a lower restitution award that took that value into account. If Nationwide's unjust gains and consumers' losses were lower than the net revenues that the Bureau established, it was Nationwide's burden to demonstrate that. It did not.

Under *Gordon*, therefore, the Bureau necessarily met its burden of proof regarding the appropriate amount of restitution. *See Gordon*, 819 F.3d at 1195. But the district court did not apply *Gordon*. Instead, it concluded that "[t]he question, therefore, is only whether restitution, and potentially disgorgement, in these amounts is otherwise appropriate." ER 35. That conclusion was in error. Under this Court's burden-shifting framework, the burden of establishing an "otherwise appropriate" amount, ER 35, did not fall on the Bureau. *Gordon*, 819 F.3d at 1195. That burden fell on Nationwide, but it declined to provide *any* evidence to meet that burden. *See id.*

The district court's reasons for deeming the restitution amount inappropriate are inconsistent with this burden-shifting framework. The court stated – incorrectly – that "[r]elatively little guidance exists as to how a court should

93

exercise discretion in circumstances where appropriate equitable relief may be less than the full measure that would theoretically be available." ER 35. The burden-shifting framework under *Gordon* provides precisely such guidance. *See Gordon*, 819 F.3d at 1195. In failing to follow this burden-shifting framework, the district court appeared to conclude that the restitution amount that the Bureau sought was unwarranted for four principal reasons.[41] All were erroneous.

First, the district court suggested that a refund of all setup fees was unwarranted because the Bureau could not show "that the IM Program never provides a benefit to consumers." ER 35. That reasoning, however, is inconsistent with *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) – a case that, as the district court itself concluded, supported the Bureau's full request for restitution. *See* ER 35. In *Figgie*, this Court upheld an award of restitution against a manufacturer that made misleading representations regarding the safety and efficacy of "heat detectors" it marketed to homeowners. *See* 994 F.2d at 598. Noting that "courts have previously rejected the contention 'that restitution is

---

[41] The court also suggested that restitution of the setup fees was not appropriate because (1) some misrepresentations "did not apply to all customers" and (2) the Bureau did not prove "that the setup fee itself was not adequately disclosed." ER 36. These reasons could (at most) show that refund of the full setup fees was not appropriate for the misrepresentations that did not apply to all consumers or for the (in the court's view non-existent) failure to adequately disclose the setup fee. These reasons would not, however, justify declining to award restitution of the setup fees for the violation that *did* apply to all consumers – namely, the misrepresentations that consumers would benefit from significant interest savings early on in the program.

available only when the goods purchased are essentially worthless,'" the Court

explained why the proper measure of restitution for products that are *not* worthless

may be measured by their full purchase price. *Id.* at 606 (citation omitted). In

passages quoted directly by the district court, *Figgie* offers an analogy to a

rhinestone merchant trying to pass off his wares as diamonds:

> The seller's misrepresentations tainted the customers' purchasing decisions. *If they had been told the truth, perhaps they would not have bought rhinestones at all or only some* . . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds *or to refunds for each detector that is not useful to them.*

ER 35-36 (quoting *Figgie*, 994 F.2d at 606) (alterations and emphasis by the

district court). *Figgie* thus establishes that restitution of the full amounts paid by

consumers is appropriate (at least where the defendant provides no basis for

calculating a lower amount), even if the product or service did provide some

benefit.

Second, the district court suggested that restitution of the fees paid by all

consumers was not appropriate because the Bureau could not show that "no fully-

informed consumer would ever elect to participate in the program." ER 35. In

other words, the district court suggested that the Bureau could not obtain the

restitution it sought because it could not show that all consumers actually relied on

the misrepresentations in deciding to purchase the product. This reasoning also

flatly contradicts this Court's precedent. *Figgie* makes clear that the government

95

need not prove "reliance by each individual consumer," as that "would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals." *Figgie*, 994 F.2d at 605 (discussing redress under analogous FTC Act). Rather, where, as here, the government "has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product," the government is entitled to "[a] presumption of actual reliance." *Id.* at 605-06. Nationwide offered nothing at trial to rebut this presumption, and the district court erred in suggesting that the Bureau bore the burden to establish reliance by all consumers. *See id.*

Third, the district court explained its denial of restitution by noting that, in *Figgie*, restitution was structured so that consumers "would not receive the windfall of both the benefit and a refund" because consumers were permitted to return their heat detectors in exchange for refunds. ER 36 (citing *Figgie*, 994 F.2d at 606). But far from showing that the possibility of windfall is an appropriate basis for refusing restitution, *Figgie* shows that district courts can fashion restitution remedies that take such matters into account. To be sure, the court could not easily make consumers "return" the services they received from Nationwide in the past, but that does not make relief inappropriate. Although it may be appropriate to deduct from the restitution amount the monetary benefit consumers received, it was *Nationwide's* burden to provide evidence of the

96

appropriate deduction under the burden-shifting framework, and it made no attempt to meet that burden. In any event, the risk of windfall by Nationwide's customers is negligible. Nationwide ceased providing services under its IM Program in 2015, at which time many consumers had not yet been in enrolled in Nationwide's program for the nine years it would have taken to realize any savings. *See* ER 27. And even if Nationwide were to resume operations, *Figgie* itself demonstrates that a restitution remedy can be fashioned so that consumers "may then make the informed choice" to remain in the program. *See Figgie*, 994 F.2d 606. The district court's concern was therefore misplaced and did not warrant a denial of restitution.

Finally, the district court stated that Nationwide's misleading representations about the timing and amount of savings involved statements that had an "articulable basis in fact." ER 36. Although the literal truth of its misstatements did not "absolve defendants of liability," the court concluded, it "further undercut the appropriateness of requiring refund of all setup fees customers paid." ER 36. For the same reasons that it was erroneous to deny restitution altogether on this basis (as discussed above), it was also erroneous to conclude that the "literal truth" of Nationwide's deceptive statements warranted any reduction in the restitution *amount*.

For these reasons, the district court committed legal error in denying the Bureau's request for restitution. Because the district court's reasons for deeming restitution inappropriate were based on "erroneous legal principles," this Court should reverse and award the Bureau restitution in the amount it established at trial. *See Pantron I*, 33 F.3d at 1102 ("Because the district court's refusal to award monetary equitable relief was based on the application of erroneous legal principles, we reverse."). In the alternative, the Court should remand this case to the district court to calculate a restitution award consistent with the controlling burden-shifting framework.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of restitution and remand the case for the district court to order Nationwide Biweekly Administration, Inc., Loan Payment Administration LLC, and Daniel Lipsky to pay restitution in the amount of $73,955,169 or to calculate restitution consistent with the CFPA's remedial provisions and the evidence presented at trial. The Court should otherwise affirm the district court's orders and judgment.

Respectfully submitted,

Dated: January 25, 2019

/s Thomas McCray-Worrall

Mary McLeod
   *General Counsel*
John R. Coleman
   *Deputy General Counsel*

Steven Y. Bressler
   *Assistant General Counsel*
Kristin Bateman
Thomas McCray-Worrall
   *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-9683 (telephone)
(202) 435-7024 (facsimile)
thomas.mccray-worrall@cfpb.gov
*Counsel for Plaintiff-Appellee*
*and Cross-Appellant*
*Consumer Financial Protection Bureau*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the Bureau states that *Consumer Financial Protection Bureau v. CashCall, Inc., et al.*, Nos. 18-55407 and 18-55479, is currently pending before this Court and raises a related issue regarding a district court's denial of restitution. In addition, issues regarding the constitutionality of the Bureau's structure are raised by the *CashCall* appeal, as well as by *Consumer Financial Protection Bureau v. Seila Law, LLC*, No. 17-56324 (oral arg. held Jan. 8, 2019), and by *Consumer Financial Protection Bureau v. D & D Marketing, Inc.*, No. 17-55709. Counsel is aware of no other case pending in this Court that is related within the meaning of Rule 28-2.6.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  | 18-15431, 18-15887 |

I am the attorney or self-represented party.

**This brief contains** | 24,166 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s Thomas McCray-Worrall | **Date** | Jan 25, 2019 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/2018*

# STATUTORY ADDENDUM

12 U.S.C. § 5536.  Prohibited acts ...................................................ADD-1

12 U.S.C. § 5565.  Relief available .................................................ADD-2

16 C.F.R. § 310.2.  Definitions .......................................................ADD-5

16 C.F.R. § 310.3.  Deceptive telemarketing acts or practices ........ADD-10

16 C.F.R. § 310.6.  Exemptions ......................................................ADD-16

**12 U.S.C. § 5536.  Prohibited acts**

(a) In general

It shall be unlawful for--

    (1) any covered person or service provider--

        (A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

        (B) to engage in any unfair, deceptive, or abusive act or practice;

….

**12 U.S.C. § 5565.  Relief available**

(a) Administrative proceedings or court actions

(1) Jurisdiction

The court (or the Bureau, as the case may be) in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law.

(2) Relief

Relief under this section may include, without limitation--

(A) rescission or reformation of contracts;

(B) refund of moneys or return of real property;

(C) restitution;

(D) disgorgement or compensation for unjust enrichment;

(E) payment of damages or other monetary relief;

(F) public notification regarding the violation, including the costs of notification;

(G) limits on the activities or functions of the person; and

(H) civil money penalties, as set forth more fully in subsection (c).

(3) No exemplary or punitive damages

Nothing in this subsection shall be construed as authorizing the imposition of exemplary or punitive damages.

(b) Recovery of costs

In any action brought by the Bureau, a State attorney general, or any State regulator to enforce any Federal consumer financial law, the Bureau, the State attorney general, or the State regulator may recover its costs in connection with prosecuting such action if the Bureau, the State attorney general, or the State regulator is the prevailing party in the action.

(c) Civil money penalty in court and administrative actions

(1) In general

Any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty pursuant to this subsection.

(2) Penalty amounts

(A) First tier

For any violation of a law, rule, or final order or condition imposed in writing by the Bureau, a civil penalty may not exceed $5,000 for each day during which such violation or failure to pay continues.

(B) Second tier

Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed $25,000 for each day during which such violation continues.

(C) Third tier

Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed $1,000,000 for each day during which such violation continues.

(3) Mitigating factors

In determining the amount of any penalty assessed under paragraph (2), the Bureau or the court shall take into account the appropriateness of the penalty with respect to--

(A) the size of financial resources and good faith of the person charged;

(B) the gravity of the violation or failure to pay;

(C) the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D) the history of previous violations; and

(E) such other matters as justice may require.

(4) Authority to modify or remit penalty

The Bureau may compromise, modify, or remit any penalty which may be assessed or had already been assessed under paragraph (2). The amount of such penalty, when finally determined, shall be exclusive of any sums owed by the person to the United States in connection with the costs of the

proceeding, and may be deducted from any sums owing by the United States to the person charged.

(5) Notice and hearing

No civil penalty may be assessed under this subsection with respect to a violation of any Federal consumer financial law, unless--

> (A) the Bureau gives notice and an opportunity for a hearing to the person accused of the violation; or

> (B) the appropriate court has ordered such assessment and entered judgment in favor of the Bureau.

**16 C.F.R. § 310.2.  Definitions**

(a) Acquirer means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

(b) Attorney General means the chief legal officer of a state.

(c) Billing information means any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(d) Caller identification service means a service that allows a telephone subscriber to have the telephone number, and, where available, name of the calling party transmitted contemporaneously with the telephone call, and displayed on a device in or connected to the subscriber's telephone.

(e) Cardholder means a person to whom a credit card is issued or who is authorized to use a credit card on behalf of or in addition to the person to whom the credit card is issued.

(f) Cash-to-cash money transfer means the electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) transfer of the value of cash received from one person to another person in a different location that is sent by a money transfer provider and received in the form of cash. For purposes of this definition, money transfer provider means any person or financial institution that provides cash-to-cash money transfers for a person in the normal course of its business, whether or not the person holds an account with such person or financial institution. The term cash-to-cash money transfer includes a remittance transfer, as defined in section 919(g)(2) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693a, that is a cash-to-cash transaction; however it does not include any transaction that is:

(1) An electronic fund transfer as defined in section 903 of the EFTA;

(2) Covered by Regulation E, 12 CFR 1005.20, pertaining to gift cards; or

(3) Subject to the Truth in Lending Act, 15 U.S.C. 1601 et seq.

(g) Cash reload mechanism is a device, authorization code, personal identification number, or other security measure that makes it possible for a person to convert

cash into an electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) form that can be used to add funds to a general-use prepaid card, as defined in Regulation E, 12 CFR 1005.2, or an account with a payment intermediary. For purposes of this definition, a cash reload mechanism is not itself a general-use prepaid debit card or a swipe reload process or similar method in which funds are added directly onto a person's own general-use prepaid card or account with a payment intermediary.

(h) Charitable contribution means any donation or gift of money or any other thing of value.

(i) Commission means the Federal Trade Commission.

(j) Credit means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(k) Credit card means any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

(l) Credit card sales draft means any record or evidence of a credit card transaction.

(m) Credit card system means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

(n) Customer means any person who is or may be required to pay for goods or services offered through telemarketing.

(o) Debt relief service means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

(p) Donor means any person solicited to make a charitable contribution.

(q) Established business relationship means a relationship between a seller and a consumer based on:

    (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or

    (2) the consumer's inquiry or application regarding a product or service offered

by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

(r) Free-to-pay conversion means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period.

(s) Investment opportunity means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

(t) Material means likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution.

(u) Merchant means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(v) Merchant agreement means a written contract between a merchant and an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(w) Negative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

(x) Outbound telephone call means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

(y) Person means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

(z) Preacquired account information means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.

(aa) Prize means anything offered, or purportedly offered, and given, or purportedly given, to a person by chance. For purposes of this definition, chance

ADD - 7

exists if a person is guaranteed to receive an item and, at the time of the offer or purported offer, the telemarketer does not identify the specific item that the person will receive.

(bb) Prize promotion means:

(1) A sweepstakes or other game of chance; or

(2) An oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize.

(cc) Remotely created payment order means any payment instruction or order drawn on a person's account that is created by the payee or the payee's agent and deposited into or cleared through the check clearing system. The term includes, without limitation, a "remotely created check," as defined in Regulation CC, Availability of Funds and Collection of Checks, 12 CFR 229.2(fff), but does not include a payment order cleared through an Automated Clearinghouse (ACH) Network or subject to the Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR part 1026.

(dd) Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

(ee) State means any state of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, and any territory or possession of the United States.

(ff) Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(gg) Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing

the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

(hh) Upselling means soliciting the purchase of goods or services following an initial transaction during a single telephone call. The upsell is a separate telemarketing transaction, not a continuation of the initial transaction. An "external upsell" is a solicitation made by or on behalf of a seller different from the seller in the initial transaction, regardless of whether the initial transaction and the subsequent solicitation are made by the same telemarketer. An "internal upsell" is a solicitation made by or on behalf of the same seller as in the initial transaction, regardless of whether the initial transaction and subsequent solicitation are made by the same telemarketer.

**16 C.F.R. § 310.3. Deceptive telemarketing acts or practices**

(a) Prohibited deceptive telemarketing acts or practices. It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Before a customer consents to pay[659] for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer;[660]

(ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

(iii) If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or, if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy;

(iv) In any prize promotion, the odds of being able to receive the prize, and, if the odds are not calculable in advance, the factors used in calculating the odds; that no purchase or payment is required to win a prize or to participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate;

(v) All material costs or conditions to receive or redeem a prize that is the subject of the prize promotion;

(vi) In the sale of any goods or services represented to protect, insure, or otherwise limit a customer's liability in the event of unauthorized use of the customer's credit card, the limits on a cardholder's liability for unauthorized use of a credit card pursuant to 15 U.S.C. 1643;

(vii) If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be

submitted for payment, and the specific steps the customer must take to avoid the charge(s); and

(viii) In the sale of any debt relief service:

(A) the amount of time necessary to achieve the represented results, and to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the time by which the debt relief service provider will make a bona fide settlement offer to each of them;

(B) to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the amount of money or the percentage of each outstanding debt that the customer must accumulate before the debt relief service provider will make a bona fide settlement offer to each of them;

(C) to the extent that any aspect of the debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the customer owes due to the accrual of fees and interest; and

(D) to the extent that the debt relief service requests or requires the customer to place funds in an account at an insured financial institution, that the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and, if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C).

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

(ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer;

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

(v) Any material aspect of a prize promotion including, but not limited to, the odds of being able to receive a prize, the nature or value of a prize, or that a purchase or payment is required to win a prize or to participate in a prize promotion;

(vi) Any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability;

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity;

(viii) That any customer needs offered goods or services to provide protections a customer already has pursuant to 15 U.S.C. 1643;

(ix) Any material aspect of a negative option feature including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); or

(x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and whether a debt relief service is offered or provided by a non-profit entity.

(3) Causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act and Regulation Z,[661] or a debit card subject to the protections of the Electronic Fund Transfer Act and

Regulation E.[662] Such authorization shall be deemed verifiable if any of the following means is employed:

(i) Express written authorization by the customer or donor, which includes the customer's or donor's signature;[663]

(ii) Express oral authorization which is audio-recorded and made available upon request to the customer or donor, and the customer's or donor's bank or other billing entity, and which evidences clearly both the customer's or donor's authorization of payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction and the customer's or donor's receipt of all of the following information:

(A) An accurate description, clearly and conspicuously stated, of the goods or services or charitable contribution for which payment authorization is sought;

(B) The number of debits, charges, or payments (if more than one);

(C) The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

(D) The amount(s) of the debit(s), charge(s), or payment(s);

(E) The customer's or donor's name;

(F) The customer's or donor's billing information, identified with sufficient specificity such that the customer or donor understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

(G) A telephone number for customer or donor inquiry that is answered during normal business hours; and

(H) The date of the customer's or donor's oral authorization; or

(iii) Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the customer or donor via first class mail prior to the submission for payment of the customer's or donor's billing information, and that includes all of the information contained in §§ 310.3(a)(3)(ii)(A)-(G) and a clear and conspicuous statement of the procedures by which the customer or donor can obtain a refund from the seller or telemarketer or charitable organization in

the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which goods or services are offered in a transaction involving a free-to-pay conversion and preacquired account information.

(4) Making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.

(b) Assisting and facilitating. It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

(c) Credit card laundering. Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this Rule for:

(1) A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;

(2) Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

(3) Any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

(d) Prohibited deceptive acts or practices in the solicitation of charitable contributions. It is a fraudulent charitable solicitation, a deceptive telemarketing act or practice, and a violation of this Rule for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

(1) The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;

(2) That any charitable contribution is tax deductible in whole or in part;

(3) The purpose for which any charitable contribution will be used;

(4) The percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program;

(5) Any material aspect of a prize promotion including, but not limited to: the odds of being able to receive a prize; the nature or value of a prize; or that a charitable contribution is required to win a prize or to participate in a prize promotion; or

(6) A charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

Footnotes

[659] When a seller or telemarketer uses, or directs a customer to use, a courier to transport payment, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before sending a courier to pick up payment or authorization for payment, or directing a customer to have a courier pick up payment or authorization for payment. In the case of debt relief services, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before the consumer enrolls in an offered program.

[660] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR 226, compliance with the disclosure requirements under the Truth in Lending Act and Regulation Z shall constitute compliance with § 310.3(a)(1)(i) of this Rule.

[661] Truth in Lending Act, 15 U.S.C. 1601 et seq., and Regulation Z, 12 CFR part 226.

[662] Electronic Fund Transfer Act, 15 U.S.C. 1693 et seq., and Regulation E, 12 CFR part 205.

[663] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

**16 C.F.R. § 310.6.  Exemptions**

(a) Solicitations to induce charitable contributions via outbound telephone calls are not covered by § 310.4(b)(1)(iii)(B) of this Rule.

(b) The following acts or practices are exempt from this Rule:

(1) The sale of pay-per-call services subject to the Commission's Rule entitled "Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992," 16 CFR part 308, provided, however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(2) The sale of franchises subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," ("Franchise Rule") 16 CFR part 436, and the sale of business opportunities subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," ("Business Opportunity Rule") 16 CFR part 437, provided, however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(3) Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization, provided, however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(4) Telephone calls initiated by a customer or donor that are not the result of any solicitation by a seller, charitable organization, or telemarketer, provided, however, that this exemption does not apply to any instances of upselling included in such telephone calls;

(5) Telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, provided, however, that this exemption does not apply to:

(i) Calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

(ii) The requirements of § 310.4(a)(9) or (10); or

ADD - 16

(iii) Any instances of upselling included in such telephone calls;

(6) Telephone calls initiated by a customer or donor in response to a direct mail solicitation, including solicitations via the U.S. Postal Service, facsimile transmission, electronic mail, and other similar methods of delivery in which a solicitation is directed to specific address(es) or person(s), that clearly, conspicuously, and truthfully discloses all material information listed in § 310.3(a)(1), for any goods or services offered in the direct mail solicitation, and that contains no material misrepresentation regarding any item contained in § 310.3(d) for any requested charitable contribution; *provided*, however, that this exemption does not apply to:

(i) Calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

(ii) The requirements of § 310.4(a)(9) or (10); or

(iii) Any instances of upselling included in such telephone calls; and

(7) Telephone calls between a telemarketer and any business to induce the purchase of goods or services or a charitable contribution by the business, except calls to induce the retail sale of nondurable office or cleaning supplies; provided, however, that §§ 310.4(b)(1)(iii)(B) and 310.5 shall not apply to sellers or telemarketers of nondurable office or cleaning supplies.

**Nos. 18-15431, 18-15887**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 25, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: January 25, 2019          /s Thomas McCray-Worrall

Thomas McCray-Worrall
Attorney for Plaintiff-Appellee
and Cross-Appellant
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-9683 (telephone)
(202) 435-7024 (facsimile)
thomas.mccray-worrall@cfpb.gov